[661 NYS2d 635]

HOME SAVINGS OF AMERICA, FSB, Respondent-Appellant, v SCOTT AMOROS et al., Defendants, ROBERT FAVATA et al., Appellants-Respondents, and NATIONAL WESTMINSTER BANK USA, Respondent.

First Department, September 4, 1997

### APPEARANCES OF COUNSEL

*James J. Coster* of counsel, New York City *(John L. Slafsky* on the brief; *Satterlee Stephens Burke & Burke, L. L. P.,* attorneys), for respondent-appellant.

*Jonathan T. Uejio* of counsel, New York City *(Conway, Farrell, Curtin & Kelly, P. C.,* attorneys), for appellants-respondents.

*Thomas J. Luz* of counsel, New York City *(Matthew R. Asman* on the brief; *Epstein Becker & Green, P. C.,* attorneys), for respondent.

### OPINION OF THE COURT

MURPHY, P. J.

Plaintiff Home Savings Bank of America, FSB (hereinafter

Home Savings), retained defendant law firm, Amoros, Favata and Wallace (hereinafter AF&W), to represent its interests as a lender in connection with home mortgage closings. The record indicates that it was the practice of Home Savings to deposit bank checks covering the amounts to be paid out at mortgage closings into a mortgage trust account opened and maintained over a period of years at defendant National Westminster Bank (hereinafter NatWest) by AF&W; AF&W, by its partners, would draw checks upon the mortgage trust account in order to disburse the funds needed at the closings at which it was representing Home Savings. It is clear that Home Savings would often wait until shortly before a closing to deposit the necessary funds and that it was not unusual when this occurred for AF&W to write checks drawing upon still uncollected funds. It is also clear that it was NatWest's practice in this set of circumstances to honor AF&W's checks; NatWest would simply extend credit to AF&W to cover its checks for the relatively brief period necessary for the bank checks deposited by Home Savings into the AF&W mortgage trust account to clear. In early October 1994, however, checks drawn by AF&W upon the mortgage trust account were presented for payment and paid by NatWest when the funds necessary to cover the checks were not simply uncollected, but entirely absent, and by the end of October 1994, NatWest had paid no fewer than 46 AF&W mortgage trust account checks, totalling some $831,163, against insufficient funds. The account ran a deficit of available funds for 27 of November's 30 days (the average negative balance of available funds was $425,924), but it was not until December 7, 1994, that NatWest undertook to return any AF&W mortgage trust account checks. On that date, 11 checks totalling some $766,102 were returned unpaid by reason of the account's insufficiency and an additional check in the amount of $389,302 was returned due to unavailable funds. Although NatWest apparently elected not to treat these checks as dishonored and accordingly made no report of dishonor pursuant to 22 NYCRR 1300.1 (c), it appears that NatWest was sufficiently concerned with the account's chronic and serious insufficiency of available funds to demand that the account be audited. On December 21, 1994, while the audit was ongoing, NatWest informed AF&W that so long as its mortgage trust account remained "overdrawn" it would return unpaid any checks purporting to draw further upon the account. By a letter of the same date, AF&W vociferously protested NatWest's announced change of policy, noting that it had been agreed when the account had been opened in 1988 and had

since been the practice for the bank to honor all AF&W mortgage trust account checks provided that covering—even if uncollected—funds in the form of a bank check were deposited on the same day the AF&W check was presented for payment. In response to this letter, NatWest evidently relented to the extent of paying one check posted on December 27, 1994 in the amount of $161,733 against insufficient funds. Also on December 27, 1994, however, the results of the mortgage trust account audit were released; the audit disclosed that AF&W partner Scott Amoros had embezzled more than $900,000 from the account. Amoros, an authorized signatory of the mortgage trust account, it seems, had since December 1992 written some 22 checks upon the mortgage trust account in various amounts totaling over $800,000. These checks were, in turn, deposited by Amoros into another NatWest account known as the Trade Funding Group account over which Amoros also had control and of which he was, in fact, the exclusive authorized signatory. NatWest's records show that during the same period in which Amoros was diverting trust account funds to the Trade Funding Group account he was also systematically withdrawing those same funds from the Trade Funding account and applying them to the satisfaction of personal obligations; between December 1992 and December 1994, Amoros removed well over $800,000 from the Trade Funding account by means of some 161 withdrawals, most of which were in the form of checks payable to himself, but which also included numerous transfers by debit advice of significant sums to Amoros' personal checking and money market accounts at NatWest.

In this action, commenced in January 1995, plaintiff Home Savings alleges, *inter alia*, that NatWest ought to be held liable for Amoros' misappropriation of the funds Home Savings entrusted to AF&W. In this connection, Home Savings maintains in its eighth cause of action that NatWest was negligent in its monitoring of the AF&W mortgage trust account and other NatWest accounts used by Amoros to accomplish the above-detailed misappropriation, and that had NatWest timely taken appropriate cognizance of the various circumstances indicative of an ongoing, unauthorized diversion of entrusted funds, the complained-of misappropriation would have been earlier detected and, at least to that extent, avoided.

■ Ordinarily, of course, a depositary bank has no duty to monitor fiduciary accounts maintained at its branches to safeguard the funds in those accounts from fiduciary misappropriation. Indeed, "[i]n general, a bank may assume that a

person acting as a fiduciary will apply entrusted funds to the proper purposes and will adhere to the conditions of the appointment (*see, Clarke v Public Natl. Bank & Trust Co.*, 259 NY 285, 288-289; *see also, Bischoff v Yorkville Bank*, 218 NY 106, 111, 113; Brady, Bank Checks § 12.1, at 12-2 [Bailey 5th ed])" (*Matter of Knox*, 64 NY2d 434, 438). In moving for summary judgment, then, NatWest's essential contention has been that its conduct with respect to the AF&W mortgage trust account at all relevant times fell within the broad sheltering ambit of this rule. While the motion court agreed with NatWest, we respectfully differ. There are recognized exceptions to the cited rule and we do not think it possible to conclude at this juncture, as a matter of law, that the facts of the instant matter do not come within those exceptions.

Notwithstanding the aforecited rule, a depositary bank may still be held answerable for the loss of funds misappropriated from a fiduciary account if the bank, with knowledge of the fiduciary's diversion of trust funds, accepts such funds in payment of a personal obligation owed by the fiduciary to the bank (*Grace v Corn Exch. Bank Trust Co.*, 287 NY 94, 102-103, *rearg denied* 287 NY 746) or the bank otherwise has actual knowledge or notice that a diversion is to occur or is ongoing (*see, Matter of Knox, supra,* at 438). Facts sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated will trigger a duty of inquiry on the part of a depositary bank (*see, Newton v Scott*, 254 App Div 140; *Board of Mgrs. of Cont. Towers Condominium v Crestmont Mgt. Corp.*, 186 AD2d 49), and a bank's failure to conduct a reasonable inquiry when the obligation to do so arises will result in the bank being charged with such knowledge as inquiry would have disclosed (*supra*).

While the record in its present state does not establish that NatWest benefited from Amoros' misappropriation, the possibility that trust funds were used to satisfy some personal obligation of Amoros to NatWest is one that cannot yet be discounted. We note that the documentation before us includes at least two checks drawn by Amoros on the Trade Funding account payable to NatWest. These checks, both of which bear what appears to be an identical loan number in the lower left-hand corner, are sufficient to raise an issue as to whether NatWest received mortgage trust funds in satisfaction of a personal Amoros debt. Additionally, the record discloses that $100,000 from the Trade Funding account was funnelled into the personal money market and checking accounts of Scott and

Irene Amoros at NatWest. This circumstance also, particularly when considered along with the Amoros' extensive banking relationship with NatWest—one in which NatWest may well have been utilized as a lender as well as a depositary—would seem to us sufficient to raise an issue of fact as to whether NatWest had received trust funds, here via one or more of the Amoros personal accounts, in repayment of some loan made by NatWest to the Amoroses personally. If there was no such loan, or there was but it was not repaid with funds fairly traceable by NatWest to AF&W's mortgage trust account, these are surely matters that NatWest should, in reliance upon its own records, be able to establish with relative ease. But if, on the other hand, at the conclusion of their passage through the several NatWest accounts utilized by Amoros to facilitate the embezzlement, AF&W mortgage trust account funds were applied to the satisfaction of a personal debt owed by Amoros to NatWest, NatWest would, under the holding of *Grace (supra)*, be liable as a participant in the embezzlement. NatWest would not under this latter scenario in which trust funds arrived in its possession entirely by means of NatWest accounts, be able to claim ignorance of the provenance of those funds, for "[n]either a large bank nor a small bank may urge that it is ignorant of facts clearly disclosed in the transactions of its customers with the bank" (*supra*, at 107), and, as noted, the bank's acceptance of the trust funds with knowledge either actual or constructive of their origin and diversion would render the bank liable.

It is important to underscore at this juncture that the mere transfer of trust funds between accounts at the depositary bank and/or disbursement of funds by authorized signatories of accounts at the depositary bank, are not, without more, sufficient grounds for bank liability (*see, Grace v Corn Exch. Bank Trust Co., supra,* at 103; *see also, Newton v Scott, supra,* at 142). There must in addition be some other circumstance implicating the bank as a participant in the diversion (i.e., acceptance of the funds in payment of a personal obligation as discussed *supra*), or indicative of the bank's neglectful countenance of an evidently intended or ongoing misappropriation. The former theory of liability and its continued viability in the present context has already been addressed. As to the latter, it too must be viewed as still viable.

There is, at the very least, a factual issue as to whether the chronic and extremely serious insufficiency of funds in the mortgage trust account in early October 1994, combined with

the contemporaneous and roughly commensurate sapping of that account into other NatWest accounts plainly being utilized by the account fiduciary, Amoros, for nontrust purposes, was sufficient to place NatWest on notice of the misappropriation. While we recognize that, as of October 1994, NatWest, as an accommodation to AF&W and, indeed, to the plaintiff, had for some time been honoring trust account checks drawn upon deposited but unavailable funds, and that this may have been an entirely reasonable business practice, it is not at all clear whether the course of dealing between the parties also embraced NatWest's honor of trust account checks drawn on funds that were not simply unavailable but wholly absent from the account. Moreover, even if the parties' practice went so far, it would not relieve the bank from its legal obligation to heed and respond appropriately to clear indicia of misappropriation of fiduciary account funds. And, among the various indicia of fiduciary misappropriation, surely account insufficiency must rank very highly, revealing as it does a telling disparity between entrusted funds and fiduciary expenditures which, in turn, may be, and often is, indicative of trust withdrawals for nontrust purposes. As one commentator has aptly observed, "Disciplinary counsel nationwide know from experience that a 'bounced check' on a lawyer's trust account is an obvious signal that law clients' money may be in jeopardy" (Alter, Outside Counsel, *Coming Jan. 1: The Dishonored Check Notice Rule,* NYLJ, Nov. 19, 1992, at 1, col 1, at 4, col 4). Indeed, it is precisely because trust account insufficiency is considered such a reliable sign of fiduciary misappropriation that depositary banks maintaining attorney trust accounts must make a dishonored check report to the Lawyers' Fund for Client Protection "whenever a properly payable instrument is presented against an attorney special, trust or escrow account which contains insufficient available funds, and the banking institution dishonors the instrument for that reason" (22 NYCRR 1300.1 [c]). While it is true, as NatWest maintains, that this rule allows banks a range of discretion in determining whether a check is to be dishonored, it is equally clear that once a bank has determined to dishonor a check because of account insufficiency, a dishonored check report must be made.

The record indicates that, on December 7, 1994, NatWest dishonored 11 AF&W mortgage trust account checks totaling some $766,102, citing as its reason for so doing the absence of sufficient funds. It is undisputed that no report of dishonor was made respecting any of these checks. Although we are not of

the view that the bank's evident default in the performance of its regulatory obligation to make a report of check dishonor suffices to establish its liability for the loss occasioned by Amoros' misappropriation, we do think such default may be adduced as some evidence of the bank's negligence. Furthermore, under the circumstances of this case, in which not one but 11 checks in very substantial amounts were dishonored in a context of long-pending account insufficiency, we think this evidence suffices to raise a triable issue as to whether the bank fulfilled its common-law obligation to acknowledge, as reasonable prudence would require, clear signs of fiduciary misappropriation from trust accounts maintained at its branches, and upon such acknowledgment to conduct a reasonable inquiry.

In this latter regard, there can be little doubt in light of the results of the December 1994 audit or the bank's own internal investigation performed in January 1995, that a reasonable investigation by the bank initiated at an earlier date would have uncovered Amoros' embezzlement. The only real issue with respect to plaintiff's negligence theory would appear to be whether the bank was in fact placed on at least inquiry notice of the embezzlement and, if it was, whether the duty to inquire was triggered at a time when the embezzlement could have been averted, at least partially.

Accordingly, the order of the Supreme Court, New York County (Stuart Cohen, J.), entered January 18, 1996, which granted defendant National Westminster Bank USA's motion for summary judgment dismissing the complaint against it, should be reversed, on the law, with costs, the motion denied, the complaint reinstated and the matter remanded for further proceedings.

Motion seeking leave to enlarge record granted.

NARDELLI, WILLIAMS and ANDRIAS, JJ., concur.

Order, Supreme Court, New York County, entered January 18, 1996, reversed, on the law, with costs, the motion for summary judgment the complaint against National Westminster Bank denied, the complaint reinstated and the matter remanded for further proceedings. Motion seeking leave to enlarge record granted.