**ATTORNEYS TITLE GUARANTY FUND, Plaintiff,**

v.

**David W. GOODMAN, et al., Defendants.**

**No. 2:99–CV–974B.**

United States District Court, D. Utah, Central Division.

Dec. 12, 2001.

Bruce A. Maak, Carolyn B. McHugh, Justin Peter Matkin, Parr Waddoups Brown Gee & Loveless, Salt Lake City, UT, for Attorney's Title Guaranty Fund.

Rex E. Madsen, Reed L. Martineau, Snow Christensen & Martineau, Salt Lake City, UT, for David W. Goodman, Strata Funding Group and Household Properties.

John L. McCoy, Salt Lake City, UT, for Rod.

Robert F. Dodenbier, Sandy, UT, for David W Goodman, Household Properties, Strata Marketing, Strata Funding Group and Chris Goodman.

James S. Jardine, Rick B. Hoggard, Arthur B. Berger, David O. Gibbon, Michael D. Mayfield, Ray Quinney & Nebeker, Salt Lake City, UT, for Brighton Bank.

Michael Horsley, Scottsdale, AZ, pro se.

David Kinney, West Point, UT, pro se.

Chris Goodman, S Jordan, UT, pro se.

## MEMORANDUM OPINION & ORDER

BENSON, Chief Judge.

### I. Introduction

Before the Court are plaintiff Attorneys Title Guaranty Fund's ("ATGF") and defendant Brighton Bank's ("Brighton") cross-motions for summary judgment. Both ATGF and Brighton rely on § 22–1–7 of the Utah Fiduciaries Act, Utah Code Ann. § 22–1–1 *et. seq.*[1], in support of their respective motions. Section 22–1–7 provides:

---

1. The Utah Fiduciaries Act is patterned after the Uniform Fiduciaries Act.

If a deposit is made in a bank to the credit of a fiduciary as such, the bank is authorized to pay the amount of the deposit or any part thereof upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check, or with knowledge of such facts that its action in paying the check amounts to bad faith. If, however, such a check is payable to the drawee bank and is delivered to it in payment of, or as security for, a personal debt of the fiduciary to it, the bank is liable to the principal, if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check.

Having considered the parties' briefs, the relevant law, and the parties' oral arguments, the Court issues the following memorandum opinion and order.

## II. Background

The material facts in this matter are undisputed. ATGF was an underwriter of a Utah title insurance agency, Granite Title Company ("Granite Title"). Granite Title maintained an escrow account at Brighton Bank that was designated as a trust account. This case stems from the alleged fraudulent conduct committed by the President of Granite Title, Ray Horsley.

Horsley was authorized to make deposits and withdrawals from the Granite Title account. Between 1997 and 1999, Horsley allegedly misappropriated funds from the escrow account and defrauded multiple parties in connection with his employment at Granite Title—an act that resulted in the Utah Department of Insurance issuing an order revoking Horsley's license to act as a title insurance agent.

Numerous Brighton employees were familiar with Horsley and the Granite Title account. Horsley's first contact with Brighton came in spring of 1996 when he opened the Granite Title trust account and met Brighton's Executive Vice President and Branch Manager, Bruce Hunt. In the spring of 1998, Horsley contacted Brighton employee Shanna Speredon[2] regarding renting office space from the bank. Horsley met James Fraser, Brighton's President and CEO, in August of 1998. Bambi Hansen, Main Office Branch operations officer, and wire supervisor Lora Holmquist, were also familiar with the Granite Title account and knew Horsley.

Horsley's conduct relevant to the present motions began in 1998. May of 1998 marked the beginning of numerous non-sufficient fund ("NSF")[3] postings on the Granite Title account. Bruce Hunt had the responsibility for and reviewed daily NSF reports generated at the Brighton main branch. Brighton had a "2:00 p.m. rule" for dealing with NSF items on their accounts. If a check came in overnight when there was not enough money in the account to cover outgoing funds, Bambi Hansen would call the customer and give him until 2:00 p.m. the next day to make a

---

2. Speredon is the Chief Financial Officer and Senior Vice President of Brighton. Speredon is also responsible for managing the "Bank Plaza"—an office complex owned and operated by Brighton in which both Brighton's main branch office and Granite Title's offices are located. Speredon also supervises the wire transfer department at Brighton.

3. NSF items occur when a request for outgoing funds in the form of a check or wire transfer exceeds the collected funds in the account. During the lifetime of the Granite Title account, some 143 NSF items appeared on the account.

deposit sufficient to cover the deficiency. If the deposit was made by 2:00 p.m., Brighton would pay the check, if not, Brighton would return it. Hunt at times made these calls himself, and personally called Horsley many times regarding the NSF items on the Granite Title account. Brighton further charged and collected fees from Granite Title because of the NSF activity.

In August, 1998, Horsley was made a $9,000 cash deposit to the escrow account. Brighton's President and CEO, James Fraser, inquired whether Horsley was aware of the $10,000 federal cash deposit reporting rule. Though Horsley stated that he was aware of the rule, Fraser testified that Horsley appeared nervous and uncomfortable as he and Horsely discussed the rule. This prompted Brighton to conduct an investigation in which Fraser asked Brighton's internal auditor to investigate whether other significant cash deposits had been made into the account. The auditor found none and, until October of 1998, no activity occurred in the Granite Title Account to generate further investigation.

On October 6, 1998, Brighton received a written wire transfer request for $150,000 out of the trust account, signed by Horsley, and naming the "Vibe Group Inc." as beneficiary. The wire was not sent because there were insufficient funds in the account to cover the wire. On October 7, 1998, a person from the Vibe Group called wire supervisor Lora Holmquist to ask about the wire. Holmquist replied that no wire was forthcoming. The representative of the Vibe Group then stated that the money was to be used to purchase stock for Horsley. This statement triggered Holmquist's suspicions that Horsley was acting inappropriately and she related the substance of the call to Bruce Hunt and Shanna Speredon. On the evening of Oc-

tober 7, Speredon, Hunt, and Fraser met to discuss the Granite Title account. During that meeting, Hunt reported that there had been NSF activity on the account and this information, coupled with the call from the Vibe Group, concerned Fraser and prompted him to instruct Hunt to contact State authorities.

On October 8, 1998, Hunt talked to Helen Cunningham, the State's title insurance investigator. Hunt explained the activity that was occurring in the Granite Title account and the next day Cunningham subpoenaed Brighton for records regarding the trust account. After clarifying the scope of the subpoena, Brighton responded with information reflecting twenty-eight NSF checks and wire transfers to alleged stockbrokers. Cunningham later told the bank that the materials provided by the bank were sufficient to satisfy the requirements of the subpoena. On October 16, 1998, during the State's investigation, Speredon approved a $150,000 wire transfer to the Vibe Group and later approved wire transfers to other brokerage firms.

While Cunningham was conducting her investigation, she learned from a third party that Granite Title had defaulted on certain mortgages. The same third party contacted ATGF regarding the unpaid mortgages and ATGF subsequently asked Brighton for the information that it had provided to the State. Brighton complied and provided the same information to ATGF. Bruce Hunt testified that, despite the third party information, and the continual posting of NSF items on the Granite Title account, in November 1998, Cunningham ultimately concluded that there was nothing wrong with the Granite Title account. According to Hunt, at some time in late 1998, Ms. Cunningham informed the bank that the State's investigation was concluded and that no improprieties had been found. Relying on that information,

Brighton took to further action to investigate its concerns about the Granite Title account.[4]

After the State alleviated Brighton's concerns, Brighton did not have any further suspicions regarding Granite Title for some time. NSF activity was consistent with the activity in the past and the Bank continued to process deposits and wire transfers from the account. In February, 1999, Brighton accepted a check from the escrow account as a payment on Granite Title's rent obligation. In May of 1999, however, Lora Holmquist's suspicions about Horsley were aroused again when she received calls from Granite Title customers stating that Horsley was giving phony outgoing wire numbers. On May 26, 1999, a Brighton branch manager also indicated that there were problems getting a title policy or a trust deed returned that Granite Title was handling. In addition, Hunt mentioned to Fraser that two large NSF checks on the account had been returned. The accumulation of this information caused Fraser to once again instruct that Hunt inform the State. Fraser was concerned about Horsley's conduct due to the possibility that people may lose money on the returned checks. Hunt talked to Peter Stevens with the State and Stevens asked Brighton to provide continual information on any NSF items posted on the Granite Title account. Brighton complied and actively participated in the State's second investigation—providing ongoing information to Stevens of NSF postings on the account. In a fax to Stevens, Hunt opined that Horsley may be investing these escrow funds for his own gain.

ATGF also learned of NSF checks on the account and again asked for bank statements regarding the account. Ultimately, on July 8, 1999, ATGF terminated Granite Title's agency appointment—the same day that the State suspended the licenses of Granite Title, Horsley, and others. Before Brighton knew of ATGF's and the State's actions, however, Horsley obtained a cashier's check, payable to Household Properties in the amount of $70,000 which left a balance of $925.89 in the trust account at the end of the day on July 8, 1999. When the bank learned of the State action, it froze the trust account.

### III. The Parties' Position

#### A. ATGF

ATGF first argues that Brighton employees had "actual knowledge" of a breach of fiduciary obligation. ATGF contends that this knowledge was gained "piece by piece" before October 1998, and culminated when Brighton received the October 6 call from the Vibe Group. ATGF claims that this call provided unmistakable evidence of a breach, especially in light of the multiple NSF items posted on the escrow account and Horsley's nervous and uncomfortable appearance during the $9,000 cash deposit. After October 6, 1998, ATGF alleges that Brighton acted with actual knowledge in processing wire transfers to brokerage firms, including the $150,000 wire transfer to the Vibe Group. ATGF also avers that additional information such as continual NSF activity, information that mortgages were not being paid, and information from customers regarding phony outgoing wire numbers contributed to Brighton's ongoing actual knowledge of Horsley's breach of fiduciary duty. ATGF contends that, in the face of this actual knowledge, Brighton continual-

---

4. Due to illness, Cunningham cannot recall many of the specific actions she took during the investigation. Cunningham also cannot recall the conversation with Hunt wherein she allegedly "passed off" on the account. Nevertheless, she does not deny making the statement.

ly processed checks and wire transfers from the account in violation of the Utah Fiduciaries Act.

ATGF further argues that Brighton acted with bad faith in failing to investigate Horsley's suspicious conduct. ATGF's contention is that the facts recited above were so obvious and cogent that it constituted bad faith for Brighton to remain passive. Essentially, ATGF accuses Brighton of furthering its financial motives in keeping the Granite Title account open by deliberately evading the knowledge of fiduciary fraud that a reasonable investigation would have uncovered. ATGF also asserts that Brighton's procedures, and in particular, the "2:00 p.m. rule" were "commercially unreasonable" and amounted to bad faith because they facilitated Horsley's fraud.

ATGF's final argument is that, pursuant to § 22–1–7, Brighton is liable for accepting a lease payment from Horsley written on the Granite Title trust account.

## B. Brighton Bank

Brighton's position is that § 22–1–7 actually shields it from liability in this case. Brighton argues that there is no material fact that points to actual knowledge on the part of Brighton and that Brighton's reporting Horsley to the State and participating in the State's investigations precludes a finding of bad faith. Finally, Brighton contends that the rent payment was accepted for Granite Title's rent obligation and not Horsley's and therefore § 22–1–7 does not impose liability on Brighton.

Regarding actual knowledge, Brighton contends that ATGF can prove no set of facts showing that any Brighton employee had actual knowledge that Horsley was breaching his fiduciary obligations. Brighton argues that actual knowledge requires a "present awareness" of a breach—an awareness that Brighton did not have at any time, even subsequent to the October 6 call from the Vibe Group. Brighton concedes that Horsley's conduct raised suspicions of improper conduct, but that those suspicions never at any time amounted to actual knowledge and were quieted by Brighton's own investigations and representations made by the State authorities.

Brighton further argues that ATGF cannot make a showing of bad faith. Brighton states that "bad faith" requires a deliberate desire to evade knowledge and thus a good faith investigation precludes a finding of bad faith. Brighton avers that it investigated its own questions regarding the Granite Title account and turned other matters over to the State. Brighton contends that it then justifiably waited upon the State's investigation before taking any action on the account. Brighton further contends that it had no abnormal financial motive in keeping the Granite Title account open. Brighton states that its procedures are not commercially unreasonable and in any event that the commercially unreasonable standard has been rejected by Utah courts. Brighton asserts that its actions brought Horsley's misappropriation of trust account funds to light and that this fact alone is inconsistent with a finding of bad faith.

Finally, Brighton argues that because the rent payment was made on behalf of Granite Title, the principal, and not on behalf of Ray Horsley, the fiduciary, § 22–1–7 does not impose any liability whatsoever on Brighton for accepting the rent payment out of the Granite Title escrow account.

## IV. Discussion

### A. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Applied Genetics Int'l v. First Affiliated Securities,* 912 F.2d 1238, 1241 (10th Cir.1990). Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1230 (10th Cir.1990). The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (quoting *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548).

In considering a summary judgment motion, this Court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Finally, all material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party.

**B. Interpretation of § 22–1–7**

As previously discussed, both parties rely on Utah Code Ann. § 22–1–7 in support of their respective motions. Prior to the passage of the Uniform Fiduciaries Act, banks were more active participants in detecting and suppressing fiduciary fraud. Indeed, banks were required to exercise the "highest degree of vigilance in the detection of a fiduciary's wrongdoing." *Zions First Nat'l Bank v. Clark Clinic Corp.,* 762 P.2d 1090, 1100 (Utah 1988). As banks began to process more and more transactions, however, debate ensued as to whether it was wise policy to place the duty of monitoring fiduciary accounts for wrongdoing on the bank's shoulders. As one court stated:

> The present banking system under which an enormous number of checks are processed daily could not function effectively if banks were not required to make prompt and effective decisions on whether to pay or dishonor checks. The [statutes] governing bank deposits and collections require banking transactions to be processed quickly and automatically and impose strict deadlines for payment or timely dishonor of checks. Under this system favoring expedited handling of funds transfers, a bank cannot be expected to track transactions in fiduciary accounts or to intervene in suspicious activities.

*Chazen v. Centennial Bank,* 61 Cal. App.4th 532, 71 Cal.Rptr.2d 462, 466 (1998).

The debate led to the passage of the Uniform Fiduciaries Act, adopted by several states, including Utah. *See* Utah Code Ann. § 22–1–1 *et. seq.* Section 22–1–7 of the Act relieved the banks of the harsh duty of exercising the high degree of vigilance required under common law in detecting fiduciary wrongdoing. Rather, the Act imposed liability upon the bank only in situations where the bank "acted with

actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check, or with knowledge of such facts that its action in paying the check amounts to bad faith." *Id.* The Act also imposed liability on the bank if it accepted a "check [ ] payable to the drawee bank and [ ] delivered to it in payment of, or as security for, a personal debt of the fiduciary to it." *Id.*

The Utah Supreme Court explained the purposes of the Act:

> The purposes to be accomplished by this Act would seem to be to facilitate transactions by relieving the depository banks and others dealing with a fiduciary from the duty imposed at common law of seeing that fiduciary funds are properly applied to the account of the principal. In other words, the statute places a duty upon principals to use only honest fiduciaries, and gives relief to those who deal with fiduciaries except where they know the fiduciary is breaching his duty to his principal or where they have knowledge of such facts that their action in dealing with the fiduciary amounts to bad faith.

*Sugarhouse Fin. Co. v. Zions First Nat'l Bank,* 21 Utah 2d 68, 440 P.2d 869, 870 (1968). Thus, the Act created a presumption that authorized fiduciaries act faithfully and represented a policy shift from common law—placing the duty of monitoring fiduciary accounts on the principal rather than on the bank and imposing liability on the bank only when it acts with actual knowledge or in bad faith.

*1. Actual Knowledge*

The Utah Fiduciaries Act does not define "actual knowledge" but the words used in the Act are very specific, clear, and unambiguous. Courts interpreting the Uniform Fiduciaries Act agree that the term is a subjective one and connotes a "present awareness" of breach of fiduciary duty. *See e.g. General Ins. Co. of America v. Commerce Bank of St. Charles,* 505 S.W.2d 454, 457 (Mo.Ct.App.1974). As the D.C. Circuit explained in the seminal case of *Colby v. Riggs Nat'l Bank:*

> [I]t appears that the purpose of the bill was to establish uniform and definite rules in the place of the diverse and indefinite rules formerly prevailing as to constructive notice of breaches of fiduciary obligations. In view of this it is obvious that in the use of the words "actual knowledge" Congress meant to change the rule previously applied in many courts, of constructive or implied or imputed knowledge, and we think there can be no doubt that there is a marked distinction between actual knowledge and constructive or implied knowledge. The former consists in express information of a fact. The latter is in the nature of a legal inference.

*Colby v. Riggs Nat'l Bank,* 92 F.2d 183, 194 (D.C.Cir.1937). Accordingly, this Court defines "actual knowledge" as it is used in the Utah Fiduciaries Act as a present awareness by a bank employee that, at the moment, the fiduciary is actually breaching his fiduciary obligations. In other words, the words exactly what they say.

■ Pursuant to the above definition, no facts exist in the case at bar indicating that any Brighton employee had "actual knowledge" of a breach. As previously discussed, ATGF alleges that Brighton's actual knowledge arose from the consistent posting of NSF items to the trust account starting in May of 1998, Horsley's nervous and uncomfortable appearance when making the $9,000 cash deposit, the stock broker's telephone call in early October 1998, wire transfers to brokerage firms, reports that a Granite Title Mortgage had not

been paid off, and reports that Horsley was giving phony outgoing wire numbers.

The facts known to Brighton, however, do not amount to "actual knowledge" of Horsley's breach and such knowledge cannot come from "piecing together facts known to different employees." *General Ins. Co. of America*, 505 S.W.2d at 457. At the most, the information known by Brighton employees created suspicions that something was amiss in the Granite Title account. The suspicions were either investigated by Brighton, reported to Brighton superiors, or reported to the proper State authorities. For example, Horsley's nervous and uncomfortable appearance during the $9,000 cash deposit was investigated and did not convey any actual knowledge of conduct constituting a breach of Horsley's fiduciary obligations. Also, the numerous NSF items posted on the account did not at any time provide actual knowledge to any Brighton employee that Horsley was misappropriating funds.[5]

The October 6 call from the Vibe Group likewise did not purvey actual knowledge but rather raised suspicions that were pursued and reported to the State.[6] After October 6, 1998, no Brighton employee testified that they knew wire transfers were improperly.[7] Finally, the information regarding the delinquent mortgage payoff and phony wire numbers only further aroused Brighton's suspicions regarding Horsley but did not constitute "actual knowledge" of any breach of fiduciary duty.

Accordingly, the Court finds Brighton did not possess the present awareness by any employee that the fiduciary was actually breaching his fiduciary obligations. Brighton was suspicious of Horsley's conduct. Suspicions, however, do not rise to actual knowledge as set forth in the statute.

### 2. Bad Faith

The Utah Fiduciaries Act does not specifically define "bad faith" but does define its opposite: "A thing is done 'in good

---

**5.** ATGF urges the Court to hold that the numerous NSF items were facts sufficient to cause a reasonably prudent person to suspect that funds are being misappropriated which in turn triggered a duty of inquiry. ATGF further argues that Brighton's "failure to conduct a reasonable inquiry when the obligation to so [arose]" should result in Brighton being "charged with such knowledge as inquiry would have disclosed." *McCartney v. Richfield Bank & Trust Co.*, 2001 WL 436154, *4 (Minn.Ct.App.2001) (quoting *Home Sav. of Am. FSB v. Amoros*, 233 A.D.2d 35, 661 N.Y.S.2d 635, 637 (N.Y.App.Div.1997)). This definition, however, is more akin to a "bad faith" inquiry and in any event is just the type of constructive knowledge that Congress sought to avoid in passing the Uniform Fiduciaries Act. *See Colby v. Riggs Nat'l Bank*, 92 F.2d 183, 194 (D.C.Cir.1937).

**6.** At oral argument, ATGF's counsel argued that Brighton possessed actual knowledge because of Lora Holmquist's testimony that after the October 6 call, she "knew that he

[Horsley] wasn't doing something right." Taken in context however, this statement does not evidence actual knowledge. Just prior to the testimony, Holmquist testified that, although she did not know why, she "didn't like Ray," and that her feelings about Horsley were the support her statement that she knew Ray was not doing something right. When pressed further and asked if she was aware that Ray should not be buying stock with funds that were in the account, Holmquist testified that she "felt [her]self that he should not be." Holmquist's feelings do not amount to actual knowledge that Horsley was in fact breaching his fiduciary obligation.

**7.** In any event, there are legitimate reasons why funds from an escrow account could be wired to brokerage firms. For example, once all the conditions regarding delivery of the deed to the purchaser are met, the seller may direct that the money deposited in the escrow account be wired to his or her brokerage firm.

faith' when it is in fact done honestly, whether it is done negligently or not." Utah Code Ann. § 22–1–1. The Utah Supreme Court elaborated on this definition in *Sugarhouse Fin. Co. v. Zions First Nat'l Bank*, 21 Utah 2d 68, 440 P.2d 869 (1968): " 'Bad faith' is the antithesis of good faith and has been defined in the cases to be when a thing is done dishonestly and not merely negligently. It is also defined as that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest." *Id.* at 870 (citations omitted).

The Utah Supreme Court defined the term further in *Research–Planning Inc. v. Bank of Utah*, 690 P.2d 1130 (Utah 1984). The court explained that bad faith was to be distinguished from negligence in that "bad faith," unlike negligence, was "willful" and manifested a "deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction,—that is to say, where there is an intentional closing of the eyes or stopping of the ears." *Id.* at 1132 (quoting *Davis v. Pennsylvania Co.*, 337 Pa. 456, 12 A.2d 66, 69 (1940)).

This Court has also had occasion to comment on the definition of "bad faith." In *Shearson Lehman Bros., Inc. v. Wasatch Bank*, 788 F.Supp. 1184 (D.Utah 1992), the Court explained that, like the "actual knowledge" inquiry, the inquiry into "bad faith" is a subjective one and that "negligence is irrelevant." *Id.* at 1195.[8]

■ Based on the cases discussed above, this Court adopts the *Research–Planning* definition and holds that "bad faith" is the subjective deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or

defect in the transaction, an intentional closing of the eyes or stopping of the ears. The Court further holds that, consistent with *Sugarhouse*, "bad faith" requires dishonesty and implies wrongdoing or some motive of self-interest. It is equivalent to the pharmacist who fills a prescription while knowing that, if he investigated, he would find the prescription a forgery.

ATGF would have the Court adopt a definition of bad faith that comports more to negligence or gross negligence. ATGF argues that the facts of this case would have triggered any reasonable bank to fully investigate Horsley's conduct. This definition would open a Pandora's Box of litigation and would be wholly inconsistent with the purposes behind the Utah Fiduciaries Act. Any time a bank honored a check or wire transfer while the fiduciary was breaching his fiduciary obligation would lead to an inquiry whether facts existed that would compel a reasonable bank to conduct an investigation. The end result of such a definition would place the duty of detecting fiduciary wrongdoing squarely upon the bank's shoulders once again—the very duty that Congress relieved from banks and placed upon the principal in passing the Uniform Fiduciaries Act. The definition of "bad faith" that the Court adopts today goes beyond negligence, however, and, in fact, negligence is irrelevant to a bad faith inquiry.

■ Applying the Court's definition to the facts of the present case does not reveal that Brighton or its employees perceived irregularities *and* then made a willful and deliberate decision not to investigate them. For example, Brighton did conduct a limited investigation after per-

---

**8.** In *Shearson,* the Court was not analyzing the Utah Fiduciaries Act, but rather analyzed the "good faith" requirement in invoking the "ficticious payee" defense found in Utah Code Ann. § 70A–3–405(1)(c). Nevertheless, the Court found the definition found in *Sugarhouse* instructive.

ceiving Horsley's nervous and uncomfortable appearance during the $9,000 cash deposit and found nothing inappropriate. Furthermore, NSF activity is not the type of information that is so cogent and obvious as to trigger a further investigation.[9] While such activity may be suspicious, "[t]o require the Bank to inquire of the circumstances of every [ ] transaction where 'suspicious circumstances' may exist would bring the wheels of commerce to a halt." *Richards v. Platte Valley Bank,* 866 F.2d 1576, 1583 (Colo.1989). Indeed, to place such a requirement on a bank would defeat the purposes of the Utah Fiduciary Act and impose once again the high degree of vigilance required of banks under common law.

■ The NSF activity coupled with the October 6 call from the Vibe Group did however prompt Brighton to notify the State. Brighton actively participated in the State's investigation and appropriately relied on the State's representations that nothing was amiss in the Granite Title account. Nevertheless, when suspicious activity reared its head again in the form of customer complaints, further NSF activity, Brighton's problem acquiring a title policy, and the giving of phony wire numbers, Brighton once again contacted the State and reported the activity. This is not the type of conduct that amounts to "bad faith." One cannot argue that Brighton remained passive because of a deliberate desire to evade knowledge. Rather, Brighton turned the matter over to the State's investigators knowing that if problems were found, the account would be closed.

■ ATGF also alleges that Brighton's "2:00 p.m. rule" was "commercially unjustifiable" and therefore amounted to bad

faith. Whether a bank's policies are commercially unjustifiable, however, is not a relevant inquiry into "bad faith" unless those procedures evidence the bank's intentional "closing of the eyes or stopping of the ears." *See Shearson Lehman,* 788 F.Supp. at 1194 (explaining that "a bank's failure to follow commercially reasonable banking procedures or to comply with its own policies generally will not constitute a lack of good faith").

Finally, Brighton did not have any inappropriate "motive of self-interest" in failing to investigate. ATGF suggests that because Brighton regarded the Granite Title account as a "good account" and one from which Brighton realized profits, Brighton had a financial motivation to ignore Horsley's fraud. "The flaw in [ATGF's] argument is that it reads too much into the *Sugarhouse* language defining bad faith as acting in one's own self interest. Were [ATGF's] interpretation to be adopted, every profit-oriented commercial activity would constitute self-interest and bad faith." *Shearson Lehman,* 788 F.Supp. at 1196.

In short, Brighton's actions do not evidence bad faith. As soon as the facts of this case raised suspicions that Horsley was acting improperly, the Bank notified the State—not once, but twice. Brighton's own investigations and its participation in the State's investigations are simply inconsistent with a finding of "bad faith" as defined by both the Utah Supreme Court and this Court.

*3. Acceptance of check payable to the drawee bank and delivered to it in payment of, or as security for, a personal debt of the fiduciary to it.*

■ Lastly, ATGF asserts that because Brighton accepted a rent payment from

---

9. Helen Cunningham, a State title insurance investigator, testified that NSF activity shows up on escrow accounts "all the time" and that she has never seen a bank inquire into them.

the escrow account on behalf of Granite Title, Brighton is absolutely liable under § 22–1–7. ATGF misreads the statute however. Section 22–1–7 imposes liability when a bank accepts a payment of a personal debt of the fiduciary to it. In effect, this portion of the Fiduciaries Act reverses the presumption that authorized fiduciaries act faithfully and creates a presumption that the fiduciary is misappropriating funds when paying personal debts from the principal's account. Thus, if Horsley would have paid a personal debt to Brighton out of the Granite Title account, the section would apply. Nevertheless, the rent payment was on behalf of Granite Title, the principal, and therefore § 22–1–7 imposes no liability.

## V. Conclusion

Based on the foregoing, the Court finds that no reasonable jury, faced with the evidence presented, could render a verdict in favor of ATGF. The Court does not find any issue of material fact indicating that Brighton acted with actual knowledge of a breach of fiduciary duty or with knowledge of such facts that its actions amounted to bad faith. Furthermore, the Court finds that Utah Code Ann. § 22–1–7 does not impose liability on Brighton for accepting Granite Title's rent payment made payable from the escrow account.

Accordingly, the Court DENIES ATGF's motion for summary judgment and GRANTS Brighton Bank's cross-motion for summary judgment.