# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP636 |
| COMPLETE TITLE: | Koss Corporation,<br>　　　　　Plaintiff-Appellant-Petitioner,<br>　　　v.<br>Park Bank,<br>　　　　　Defendant-Third-Party<br>　　　　　Plaintiff-Respondent-Cross-Appellant,<br>　　　v.<br>Michael J. Koss,<br>　　　　　Third-Party<br>　　　　　Defendant-Appellant-Cross-Respondent,<br>Grant Thornton LLP,<br>　　　　　Third-Party Defendant-Cross-<br>　　　　　Respondent. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 379 Wis. 2d 639, 907 N.W.2d 447
PDC No:　2018 WI App 1 - Published

| | |
|---|---|
| OPINION FILED: | January 29, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 7, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| 　COURT: | Circuit |
| 　COUNTY: | Milwaukee |
| 　JUDGE: | David L. Borowski |

| | |
|---|---|
| JUSTICES: | |
| 　CONCURRED: | A.W. BRADLEY, J. concurs, joined by ABRAHAMSON, J., and DALLET, J. (opinion filed). |
| 　DISSENTED: | KELLY, J. dissents joined by R.G. BRADLEY, J. (opinion filed). |
| 　NOT PARTICIPATING: | |

ATTORNEYS:

　　For the plaintiff-appellant-petitioner and third-party defendant-appellant-cross-respondent, there were briefs filed by *Michael S. Yellin*, *Ralph Weber*, and *Gass Weber Mullins LLC*, Milwaukee, with whom on the brief were *Michael J. Avenatti*, *Ahmed Ibrahim*, and *Eagen Avenatti LLP*, Newport Beach, California.  There was an oral argument by *Ahmed Ibrahaim*.

For the defendant-third-party-plaintiff-respondent-cross-appellant, there was a brief filed by *Dean P. Laing*, *Gregory W. Lyons*, *Joseph D. Newbold*, and *O'Neil*, *Cannon*, *Hollman*, *DeJong & Laing S.C.*, Milwaukee. There was an oral argument by *Dean Laing*.

For the third-party-defendant-cross-respondent, there was a brief filed by *Joseph L. Olson* and *Michael Best & Friedrich LLP*, Milwaukee. There was an oral argument by *Joseph Olson*.

An amicus curiae brief was filed on behalf of Wisconsin Bankers Association and the American Bankers Association by *John E. Knight*, *James E. Bartzen*, *Kirsten E. Spira*, and *Boardman & Clark LLP*, Madison.

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No. 2016AP636
(L.C. No. 2010CV21290)

STATE OF WISCONSIN     :     IN SUPREME COURT

Koss Corporation,

       Plaintiff-Appellant-Petitioner,

  v.

Park Bank,

       Defendant-Third-Party
       Plaintiff-Respondent-Cross-Appellant,

  v.

Michael J. Koss,

       Third-Party
       Defendant-Appellant-Cross-Respondent,

Grant Thornton LLP,

       Third-Party Defendant-Cross-
       Respondent.

**FILED**

**JAN 29, 2019**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. We review a published decision of the court of appeals[1] that affirmed an

---

[1] Koss Corp. v. Park Bank, 2018 WI App 1, 379 Wis. 2d 629, 907 N.W.2d 447.

order of the circuit court[2] granting summary judgment dismissing Koss Corporation's Uniform Fiduciaries Act (UFA) claim against Park Bank.[3]

¶2  Our review centers on two related issues:  First, consistent with the UFA, we interpret and apply the terms "good faith" as set out in Wis. Stat. § 112.01(1)(c) and "bad faith" employed in § 112.01(9); and second, we determine whether summary judgment dismissing Koss Corporation's claim was properly granted.

¶3  We conclude Wis. Stat. § 112.01(1)(c) describes the term "good faith" as honest bank acts, even when negligently done, and consistent with the majority of jurisdictions' interpretations of the UFA, "bad faith" is inconsistent with the statutory criteria for "good faith."  Therefore, bad faith pursuant to § 112.01(9), which is an intentional tort, may be shown by acts evidencing bank dishonesty such as a bank willfully failing to further investigate compelling and obvious known facts suggesting fiduciary misconduct because of a deliberate desire to evade knowledge of fiduciary misconduct.

---

[2] The Honorable David L. Borowski of Milwaukee County presided.

[3] Wisconsin Stat. § 112.01 (2015-16) is Wisconsin's version of the UFA.

All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

¶4 We further conclude that given the allegations that Koss Corporation asserts in regard to its claim that Park Bank is liable for the intentional tort of bad faith, no proof has been proffered of bank dishonesty wherein Park Bank willfully failed to further investigate compelling and obvious known facts suggesting fiduciary misconduct because of a deliberate desire to evade knowledge of fiduciary misconduct.

¶5 Accordingly, we affirm the court of appeals' affirmance of the circuit court's dismissal of Koss Corporation's claim that Park Bank acted in bad faith in processing the transactions that Sujata Sachdeva initiated. Because we conclude Park Bank is not liable to Koss Corporation, we also affirm the dismissal of Park Bank's third-party claims.[4]

## I. BACKGROUND

¶6 In this lawsuit, Koss Corporation seeks to collect millions of dollars from Park Bank that Sachdeva embezzled from its accounts at Park Bank. As Vice President of Finance for Koss Corporation, Sachdeva was one of three people authorized to conduct transactions from Koss Corporation's Park Bank accounts pursuant to bank signature cards.[5] As was explained by Park

---

[4] Two justices join in the totality of the decisions expressed in this opinion: Chief Justice Patience Drake Roggensack and Justice Annette Kingsland Ziegler. The opinions of other justices in regard to the issues presented for the court's review are found in the separate opinions that follow.

[5] Sachdeva also served as Secretary and Principal Accounting Officer for Koss Corporation.

Bank's attorney at oral argument, nothing prohibited Sachdeva from exercising her transaction authority for Koss Corporation's accounts at Park Bank through another Koss Corporation employee so long as Sachdeva made the decision to initiate the transaction.

¶7 Sachdeva embezzled approximately $34 million from Koss Corporation over a period of ten years, from about 1999 until she was caught in 2009. In 2010, she pled guilty to six counts of wire fraud in connection with her embezzlement from Park Bank and from Koss Corporation's Chicago banks. She was sentenced to eleven years in prison and ordered to pay $34 million in restitution.

¶8 One method Sachdeva used to embezzle funds from Koss Corporation was to order cashier's checks for personal expenditures. She admits that she used hundreds of cashier's checks drawn on Koss Corporation's Park Bank accounts to pay for her purchases from luxury retailers, as well as to pay her personal credit card bills. She sometimes used the payee's initials to avoid detection, such as "S.F.A., Inc." for Saks Fifth Avenue or "N.M." for Nieman Marcus.

¶9 Generally, Sachdeva did not go to the bank herself to obtain cashier's checks. Instead, she instructed Julie Mulvaney, another Koss Corporation employee, to call the bank and request a cashier's check on Sachdeva's behalf. Mulvaney was not a signatory on Koss Corporation's Park Bank accounts. Despite the existence of the signature cards, Park Bank's

general practice was to allow non-signatories to call and request cashier's checks on a signatory's behalf.

¶10 After receiving telephone requests for cashier's checks, Park Bank would place the checks in an envelope to Sachdeva's attention. Sachdeva would then send another Koss Corporation employee, usually Betty Caver, to pick up the envelopes. Caver was not a signatory on Koss Corporation's account. The employees who picked up the checks were not asked to present signed documentation from Sachdeva, and Park Bank did not call Sachdeva to verify the transactions. When the cashier's checks reached Sachdeva, she would mail them to her creditors to pay personal debts.

¶11 On one occasion in January of 2004, Betty Caver went into the bank and endorsed a $60,598.03 counter check[6] against a Koss Corporation account, made payable to cash. Park Bank did not call Sachdeva to verify the transaction. The funds were then used to purchase two cashier's checks in the amounts of $42,441.61 and $18,156.42, which were used to pay Sachdeva's personal credit card bills to American Express and Comerica Bank. Koss Corporation does not dispute that Caver, Mulvaney, and any other employees involved were acting at Sachdeva's direction.

¶12 Sachdeva also used "petty cash" requests to embezzle funds. Sachdeva would instruct a non-signatory Koss employee,

---

[6] A counter check is a check available at a bank that can be used to make a withdrawal from an account at the bank.

usually Betty Caver, to go to the bank and endorse a manually written check made out to "petty cash." Sachdeva would call and tell the bank the employee was coming. The employee would pick up cash for Sachdeva, sometimes from a drive-through window, without being asked for identification. Sachdeva used the cash to pay her "handyman," as well as to buy shoes, purses, and dinners. The petty cash requests were often for thousands of dollars at a time. From 2005 to 2009, there were at least 43 such "petty cash" checks, totaling $171,985.02.

¶13 Sachdeva's third method of embezzling funds, and the method that eventually led to her downfall, was to request wire transfers to an out-of-state bank where Koss Corporation maintained accounts. Between 2004 and 2009, Park Bank made seven wire transfers totaling $2 million from Koss Corporation's Park Bank accounts to Koss Corporation's accounts in Chicago banks. Either Sachdeva or Mulvaney would call Park Bank and initiate the wire transfer over the phone by providing a "repetitive code," which was used in lieu of providing account numbers when the same client regularly wired money between the same two accounts. Park Bank's policy required a wire transfer agreement to initiate wire transfers, which Koss Corporation did not have.

¶14 In December of 2009, an employee from American Express's fraud department called Michael Koss[7] directly and

---

[7] Michael Koss was Koss Corporation's President, COO, CEO, and CFO.

6

informed him that Sachdeva had been using wire transfers from Koss Corporation's Chicago bank account to pay her credit transactions with American Express. This call led to Sachdeva's prosecution and eventual guilty plea.

¶15 In 2010, Koss Corporation originally sued Park Bank for negligence. It later amended its complaint to add a UFA "bad faith" claim, and to add factual information about the petty cash and wire transfers. Park Bank filed a third-party complaint against Michael Koss and against Koss Corporation's auditors, Grant Thornton LLP, for contribution and equitable subrogation. In 2013, Koss Corporation dismissed its negligence claim with prejudice. Its second and third amended complaints both asserted bad faith under the UFA as the sole claim for relief.

¶16 In support of its claims, none of Koss Corporation's factual allegations asserted, or even implied, that Park Bank acted dishonestly such as being motivated by self-interest with regard to the transactions Sachdeva initiated. Furthermore, none of Koss Corporation's allegations assert that Park Bank suspected that Sachdeva was acting improperly. After considerable discovery was completed, Park Bank moved for summary judgment on the UFA bad faith claim.

¶17 On March 11, 2016, the Milwaukee County Circuit Court granted Park Bank's motion for summary judgment, thereby dismissing all claims against Park Bank. It also dismissed the third-party complaint against Grant Thornton LLP and Michael J. Koss. In regard to the claims against Park Bank, the circuit

7

court first held that Park Bank, as the moving party, had met its initial burden and that Koss Corporation had failed to establish the existence of a material factual dispute. The circuit court concluded that to show bad faith under the UFA, Koss Corporation would have had to have provided evidence that Park Bank intentionally ignored evidence of Sachdeva's breach of her fiduciary obligations, which Koss Corporation had failed to do.

¶18 The court of appeals affirmed the circuit court's decision dismissing Koss Corporation's UFA claim. Koss Corp. v. Park Bank, 2018 WI App 1, ¶2, 379 Wis. 2d 629, 907 N.W.2d 447. The court of appeals first acknowledged that Wisconsin's version of the UFA must be interpreted to make Wisconsin law uniform with the law of other states that have enacted the UFA. Id., ¶23; Wis. Stat. § 112.01(14). After reviewing case law from other UFA jurisdictions, the court of appeals created a two-element test for bad faith that required a showing of:

> 1) circumstances that are suspicious enough to place a bank on notice of improper conduct by the fiduciary; and 2) a deliberate failure to investigate the suspicious circumstances because of a belief or fear that such inquiry would disclose a defect in the transaction at issue.

Koss Corp., 379 Wis. 2d 629, ¶27.

¶19 The court of appeals agreed with the circuit court's determination that Park Bank had established prima facie eligibility for summary judgment, id., ¶29, and that Koss Corporation failed to controvert that eligibility with a genuine issue of material fact as to whether Park Bank acted with bad

8

faith regarding Sachdeva's embezzlement, id., ¶50. Because the court of appeals concluded that Park Bank was not liable to Koss Corporation, the court of appeals did not address Park Bank's third-party complaints. Id., ¶2 n.3.

¶20 We granted Koss Corporation's petition for review and now affirm.

## II. DISCUSSION

### A. Standard of Review

¶21 This case requires us to interpret and apply statutes, and to review a grant of summary judgment. "Statutory interpretation and the application of a statute to a given set of facts are questions of law that we review independently, but benefiting from the analyses of the court of appeals and the circuit court." Marder v. Bd. of Regents, 2005 WI 59, ¶19, 286 Wis. 2d 252, 706 N.W.2d 110.

¶22 We also independently review grants of summary judgment, applying the same methodology as the circuit court and the court of appeals, while once again benefitting from their analyses. Dufour v. Progressive Classic Ins. Co., 2016 WI 59, ¶12, 370 Wis. 2d 313, 881 N.W.2d 678. "The standards set forth in Wis. Stat. § 802.08 are our guides." Id.

### B. The Uniform Fiduciaries Act

#### 1. History of UFA

¶23 The UFA was approved by the National Conference of Commissioners on Uniform State Laws in 1922. It was adopted by Wisconsin in 1925, and is set out in Wis. Stat. § 112.01(1)-

(16). <u>Bolger v. Merrill Lynch Ready Assets Tr.</u>, 143 Wis. 2d 766, 774, 423 N.W.2d 173 (Ct. App. 1988).

¶24 Prior to the development of the UFA, a bank could be found liable to a principal in common law negligence if the bank "negligently assisted a fiduciary in misappropriating [the] principal's funds." <u>Maryland Cas. Co. v. Bank of Charlotte</u>, 340 F.2d 550, 553 (4th Cir. 1965). Some courts "went so far as to charge depository banks with constructive notice of fiduciary misconduct." <u>Bolger</u>, 143 Wis. 2d at 774. The result burdened banks with the duty of "seeing that fiduciary funds are properly applied to the account of the principal." <u>Sugarhouse Fin. Co. v. Zions First Nat'l Bank</u>, 440 P.2d 869, 870 (Utah 1968).

¶25 As banking grew as a business and "[a]s banks began to process more and more transactions," policymakers questioned "whether it was wise policy to place the duty of monitoring fiduciary accounts for wrongdoing on the bank's shoulders." <u>Attorneys Title Guar. Fund v. Goodman</u>, 179 F. Supp. 2d 1268, 1274 (D. Utah 2001). This led several states, including Wisconsin in 1925, to adopt the newly drafted UFA. <u>Id.</u>; <u>Bolger</u>, 143 Wis. 2d at 774.

¶26 The UFA's purpose was to "facilitate banking and financial transactions" by "provid[ing] relief from the dire consequences of the common law rule," as well as to "place on the principal the burden of employing honest fiduciaries." <u>Bolger</u>, 143 Wis. 2d at 774-75; <u>Johnson v. Citizens Nat'l Bank</u>, 334 N.E.2d 295, 300 (Ill. App. 1975). Adoption of the UFA evinced a recognition of the economic importance of allowing

10

banks to efficiently process a high volume of transactions. For this reason, courts have long recognized that a return to the common law rule of liability based on negligence by a bank "would practically put an end to the banking business," Am. Sur. Co. of N.Y. v. First Nat'l Bank in W. Union, 50 F. Supp. 180, 185-86 (N.D. W. Va. 1943), and that "[t]he present banking system under which an enormous number of checks are processed daily could not function effectively if banks were not required to make prompt and effective decisions on whether to pay or dishonor checks." Chazen v. Centennial Bank, 71 Cal. Rptr. 2d 462, 466 (Ct. App. 1998).

### 2. Koss Corporation's Claim[8]

¶27 Koss Corporation grounds its claim in Wis. Stat. § 112.01(9), which states in relevant part:

> If a check is drawn upon the account of a fiduciary's principal in a bank by a fiduciary, who is empowered to draw checks upon his or her principal's account, the bank is authorized to pay such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of the fiduciary's obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith. If, however, such a check is payable to the drawee bank and is delivered to it in payment of

---

[8] In the case before us, Wis. Stat. § 112.01(9) is argued as a claim against Park Bank, rather than as a defense to a claim that Park Bank assisted Sachdeva's unlawful conduct. Accordingly, we shall discuss it as a claim. However, Compare Appley v. West, 832 F.2d 1021, 1031 (7th Cir. 1987) (explaining that the "UFA did not create the cause of action. Rather, the UFA is a defense."); Manfredi v. Dauphin Deposit Bank, 697 A.2d 1025, 1029-30 (1997) (same).

or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of the fiduciary's obligation as fiduciary in drawing or delivering the check.

¶28 Wisconsin Stat. § 112.01(9), quoted above, provides three entirely different standards whereby a bank could be liable: (1) when a bank had actual knowledge of the unlawful conduct of a fiduciary; (2) when a bank had knowledge of sufficient facts to show that it acted in bad faith by honoring a fiduciary's withdrawals from the principal's account; or (3) when a drawee bank accepts its own check in payment of or as security for a personal debt of the fiduciary at the drawee bank, contrary to the interest of the principal.[9]

¶29 Koss Corporation sued Park Bank alleging that the bank's transactions with Sachdeva were done in bad faith. Koss Corporation did not allege, nor has any proof been shown, that Park Bank had knowledge of Sachdeva's unlawful conduct or that it paid, or used Koss's funds as security for, personal debts of Sachdeva at Park Bank. Accordingly, we focus on defining bad faith.

### 3. Defining "Bad Faith"

¶30 The UFA does not define bad faith. It does, however, define good faith. Under the UFA, "[a] thing is done 'in good

---

[9] Maryland Cas. Co. v. Bank of Charlotte, 340 F.2d 550, 554-55 (4th Cir. 1965) is often cited. There, the Bank of Charlotte had a monetary interest in the transactions where it received checks drafted on the corporation's account at the bank and applied those checks to the employee's private debt at the bank.

faith' . . . when it is in fact done honestly, whether it be done negligently or not." Wis. Stat. § 112.01(1)(c). A bank does not violate its obligations to its depositor if its transactions with the depositor's fiduciary are honestly done. Buffets, Inc. v. Leischow, 732 F.3d 889, 899, (8th Cir. 2013); Rheinberger v. First Nat. Bank of St. Paul, 150 N.W.2d 37, 41 (Minn. 1967) (concluding that "[b]ad faith does not exist if the bank was acting honestly.").

¶31 Accordingly, the definition of good faith under Wis. Stat. § 112.01(1)(c) implies that bad faith under § 112.01(9) must involve something more than negligent bank conduct and must involve conduct during which the bank did not act honestly. Because § 112.01 is a uniform law, we consider decisions from other jurisdictions that have defined bad faith. § 112.01(14). As we do so, we note that variations in facts from which claims of bad faith arose have resulted in different expressions of the definition of bad faith, with bank dishonesty expressed in most decisions. See Attorneys Title Guar. Fund, 179 F. Supp. 2d at 1277 (concluding that "bad faith is the subjective deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction . . . [and] bad faith requires dishonesty and implies wrongdoing or some motive of self-interest" when considering repetitive nonsufficient fund activities); N.J. Title Ins. Co. v. Caputo, 748 A.2d 507, 514 (N.J. 2000) (concluding that when "facts suggesting fiduciary misconduct are compelling and obvious, it is bad faith to remain passive and

13

not inquire further because such inaction amounts to a deliberate desire to evade knowledge" of improper trust account transactions); Rheinberger, 150 N.W.2d at 41 (concluding that bad faith in making transfers between accounts by a son who had power of attorney for his mother "does not exist if the bank was acting honestly").

¶32 As a preliminary matter, we do not apply Wisconsin common law from other contexts to define "bad faith" under Wis. Stat. § 112.01(9) because bad faith under the UFA requires interpretation of a term in a specific statute. Under Wisconsin common law, the definitions of bad faith and good faith can vary depending on the context in which they arise. For example, in contract law, bad faith does not simply mean the absence of good faith because good faith can be defined in a number of ways by contract. Amoco Oil Co. v. Capitol Indem. Corp., 95 Wis. 2d 530, 542, 291 N.W.2d 883 (Ct. App. 1980). In an insurance context, bad faith and good faith have developed definitions relative to an insurer's obligations. Roehl Trans., Inc. v. Liberty Mut. Ins. Co., 2010 WI 49, ¶49, 325 Wis. 2d 56, 784 N.W.2d 542.

¶33 That said, our task is to define bad faith as it is used in Wis. Stat. § 112.01(9). We are required to interpret and apply the provisions of § 112.01 "to effectuate its general purpose to make uniform the law of those states which enact it." § 112.01(14). Given that legislative directive, as we define

bad faith, we consider judicial decisions from other jurisdictions that have adopted the UFA.[10]

a. Bad faith principles and criteria

¶34 There are a number of general principles and specific criteria that appear repeatedly in decisions from other jurisdictions as courts have considered how to analyze and to define bad faith. We will not address all of them, but rather, we will discuss those general principles and specific criteria that appear most frequently and have been central to the reasoning of many courts as they sought to analyze and define bad faith.

¶35 We begin by noting that under the UFA when presented with the issue of bad faith, generally courts consider the circumstances surrounding each fiduciary transaction, individually. They do not aggregate circumstances as though each transaction were a part of preceding transactions. We agree that aggregation of transactions is inapposite, relying on the structure of Wis. Stat. § 112.01(9) and prior UFA decisions.

¶36 Wisconsin Stat. § 112.01(9) states that "[i]f a check is drawn upon the account of a fiduciary's principal in a bank by a fiduciary, who is empowered to draw checks upon his or her

---

[10] All states that have adopted the UFA have not adopted the same version as has Wisconsin, e.g., Peoples Nat. Bank v. Guier, 145 S.W.2d 1042, 1047 (Ky. 1940) (explaining that the Kentucky version of the UFA does not contain the same provisions as Wisconsin has in Wis. Stat. § 112.01(9)). Sometimes the differences in state law matter in regard to the usefulness of a decision from such a state and sometimes they do not.

principal's account," the bank is liable to the principal if "its action in paying the check amounts to bad faith."[11] Section 112.01(9) does not envision aggregation of general protections from fiduciary misconduct.[12] As the Eighth Circuit recently explained, "[t]he UFA is drawn in terms of specific transactions made in violation of certain fiduciary obligations." Buffets, Inc., 732 F.3d at 899. It does not provide "general protection" to principals, but rather, "provides principals limited protection against a bank's knowing or bad-faith processing of a specific transaction that breaches a fiduciary obligation." Id. at 900; see also Rosemann v. St. Louis Bank, No. 14-CV-983-LLR, slip op. at *14 (E.D. Mo. Nov. 17, 2015). Furthermore, a bank has no obligation to piece together various transactions by a fiduciary, but rather it is permitted to engage in the presumption that the fiduciary is acting in accord with the fiduciary's lawful authority for each transaction. Gen. Ins. Co. of Am. v. Commerce Bank of St. Charles, 505 S.W.2d 454, 457 (Mo. Ct. App. 1974).

---

[11] Wisconsin Stat. § 112.01(9) also provides that if "a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of the fiduciary's obligation as fiduciary." This appears to assign a bank greater potential for liability. However, those circumstances are not present in the matter before us.

[12] We also note that the text of Wis. Stat. § 112.01(9) employs singular forms of nouns and verbs.

¶37 This is not to say that when examining an individual transaction about which the bank has become suspicious, previous transactions by the fiduciary cannot be examined as the bank considers whether the fiduciary has breached a fiduciary obligation in the current transaction. The focus, however, is on whether the bank exhibited bad faith with regard to the individual transaction in question at the time the transaction occurred. Mikrut v. First Bank of Oak Park, 832 N.E.2d 376, 387 (Ill. App. 2005).

¶38 In their decisions, courts often have opined on whether the standard for bad faith is subjective or objective, with the majority concluding that the test is subjective. See, e.g., Caputo, 748 A.2d at 514. The conclusion that bad faith is determined by a subjective standard contrasts with the due care or objective reasonableness standard applicable to negligence determinations because the UFA directs that negligence is insufficient to support liability for a fiduciary's conduct. See id. And finally, the vast majority of UFA decisions hold, and Koss Corporation has repeatedly conceded, that bad faith under the UFA is an intentional tort. See Lawyers Title Ins. Corp. v. Dearborn Title Corp., 904 F. Supp. 818, 820 (N.D. Ill. 1995). It would be unusual to conclude that an intentional tort does not require subjective intent.

¶39 In regard to particular factors that are indicative of bad faith, most courts have concluded that dishonesty is a necessary component in the assessment of whether a bank has acted in bad faith. See, e.g., Caputo, 748 A.2d at 514

17

(explaining that the dishonesty standard "has been a static epithet in our bad faith jurisprudence"); Research-Planning, Inc. v. Bank of Utah, 690 P.2d 1130, 1132 (Utah 1984) (reasoning that bad faith requires a dishonest purpose and implies some motive of self-interest by the bank); Bd. of Cty. Comm'rs of Hot Springs Cty. v. First Nat'l Bank of Thermopolis, 368 P.2d 132, 139 (Wyo. 1962) (concluding that bad faith "is not simply bad judgment" but "imports a dishonest purpose"); Nat'l Cas. Co. v. Caswell & Co., 45 N.E.2d 698, 699 (Ill. App. Ct. 1942) (holding that "bad faith imports a dishonest purpose"); Edwards v. Northwestern Bank, 250 S.E.2d 651, 657 (N.C. 1979) (adopting the dishonesty standard for bad faith and concluding that dishonesty "is, unlike negligence, wilful"); C-Wood Lumber Co. v. Wayne Cty. Bank, 233 S.W.3d 263, 284 (Tenn. Ct. App. 2007) (requiring a UFA plaintiff to prove that "the bank was acting dishonestly or that the bank actually knew [the fiduciary] was breaching her fiduciary obligations").

¶40 When the bank permits a fiduciary to use the principal's funds to pay his or her personal debt to the same bank where the principal's account is located, dishonesty of a type involved in bad faith is shown. Maryland Cas. Co., 340 F.2d at 554 (affirming that "where a bank had both reason to suspect a misappropriation by the fiduciary and a monetary interest in the continuance of such activity" dishonesty under the UFA is evidenced) (citing Union Bank and Trust Co. v. Girard Trust Co., 161 A. 865 (Pa. 1932)).

18

¶41 In contrast to negligence, dishonesty is viewed as requiring purposeful bank conduct. See, e.g., Caputo, 748 A.2d at 513 (concluding that dishonesty is "a way of differentiating bad faith from negligence in terms of purpose."); Guild v. First Nat'l Bank of Nev., 553 P.2d 955, 958 (Nev. 1976) (concluding that a showing of "conscious purposeful misconduct" is required for bad faith).

¶42 In Davis v. Pa. Co. for Ins. on Lives & Granting Annuities, 12 A.2d 66 (Pa. 1940), the Pennsylvania Supreme Court articulated a test for distinguishing bad faith from mere negligence that has since been repeated in numerous UFA cases across the country:

> At what point does negligence cease and bad faith begin? The distinction between them is that bad faith, or dishonesty, is, unlike negligence, willful. The mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction,——that is to say, where there is an intentional closing of the eyes or stopping of the ears.

Id. at 69 (internal citations omitted). The court's reasoning supports the conclusion that "a thing is done in bad faith . . . only when it is done dishonestly and not merely negligently." Id. at 68. Many states use this "dishonesty standard" to define bad faith. See, e.g., Smith v. Halverson, 273 N.W.2d 146, 151-52 (S.D. 1978); Sugarhouse Fin. Co., 440 P.2d at 870.

19

¶43 However, the dishonesty involved in bad faith does not require "a high degree of moral guilt." Maryland Cas. Co., 340 F.2d at 554; see also Caputo, 748 A.2d at 514 (dishonesty "should not be interpreted as having sinister implications"). "Neither criminal fraud nor downright corruption is an essential ingredient of legal 'bad faith.'" Maryland Cas. Co., 340 F.2d at 554. Rather, "wrongdoing or some motive of self-interest" by the bank is required for bad faith. Sugarhouse Fin. Co., 440 P.2d at 870.

¶44 In addressing dishonesty, none of these opinions eliminated the subjective purpose requirement that has been a necessary component of bad faith under the UFA. In Caputo, for example, the New Jersey Supreme Court explained that the dishonesty standard is "a way of differentiating bad faith from negligence in terms of purpose." Caputo, 748 A.2d at 514. In Maryland Cas. Co., where the Bank of Charlotte permitted a fiduciary to credit checks written on the principal's account to her personal debt at the bank, the Fourth Circuit asked whether it was commercially unjustifiable for the payee to "disregard and refuse to learn facts readily available." Maryland Cas. Co., 340 F.2d at 554. The Eighth Circuit has recently reaffirmed that a bank cannot be liable for failing to investigate suspicious circumstances unless that failure to investigate is due to "the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction." Buffets, Inc., 732 F.3d at 901 (citations omitted); see also Nations Title Ins. of N.Y., Inc.

20

v. Bertram, 746 N.E.2d 1145, 1151 (Ohio App. 3d 2000) (concluding that "failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith . . . unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction"). Subjective intent grounded in dishonest purpose has been required in the majority of UFA decisions.

¶45 Koss Corporation points to language from a few opinions that it contends evidences an objective test for bad faith, citing Caputo, Master Chem. Corp. v. Inkrott and UNR-Rohn, Inv. v. Summit Bank of Clinton Cty.

¶46 In Caputo, the court reasoned that "where facts suggesting fiduciary misconduct are compelling and obvious, it is bad faith to remain passive and not inquire further because such inaction amounts to a deliberate desire to evade knowledge." Caputo, 748 A.2d at 514.

¶47 Master Chem. Corp. v. Inkrott, 563 N.E.2d 26, 31 (Ohio 1990), employs similar language in explaining that a bank acts in bad faith when "facts and circumstances" are "so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." According to Koss Corporation, the words "would amount to a deliberate desire" taken from Inkrott and Caputo suggest that an actual, subjective desire to evade knowledge need not exist. Koss Corporation also asserts that because courts deciding summary

21

judgment motions under the UFA have asked whether "a trier of fact could conclude that it was commercially unjustifiable for [the bank] to disregard and refuse to learn facts readily available," as occurred in UNR-Rohn, Inc. v. Summit Bank of Clinton Cty., 687 N.E.2d 235, 239 (Ind. App. 1997) an objective standard is inferred.

¶48 Koss Corporation's arguments are interesting, but when the quoted language is read in context, they do not support the use of an objective standard to define bad faith. For example, in Caputo, the court clarified the phrase, "amounts to a deliberate desire to evade knowledge." The court explained that it was "differentiating bad faith from negligence in terms of purpose." Caputo, 748 A.2d at 514. The court further clarified that the required determination was "whether the bank recklessly disregarded or was purposefully oblivious to facts suggesting impropriety by Caputo." Id. Caputo explained that "bad faith denotes a reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary." Id. The court's reasoning is based on a subjective test. Stated otherwise, negligence, for which an objective standard is employed, is insufficient to support bad faith under Wis. Stat. § 112.01(9).

¶49 The existence of facts suggesting fiduciary misconduct can, of course, serve as strong evidence of bank dishonesty, such as when facts are so "compelling and obvious" that the factfinder may be able to infer dishonesty on the part of a bank employee. The focus, however, must be on the employee's state

22

of mind, not on the circumstances alone. This is what the Caputo decision meant by describing fiduciary misconduct as "compelling and obvious" to the bank's employee; otherwise, it would not have held that "the test for good faith or bad faith is a subjective one." Caputo, 748 A.2d at 514. To focus exclusively on facts suggesting fiduciary misconduct, without considering their effect on the employee's state of mind, would be to transform the test for "bad faith" into an objective one, and would thereby cause Wisconsin's interpretation of the UFA to be inconsistent with the majority of other jurisdictions that have adopted the UFA.

¶50 Similarly, the "commercially unjustifiable" language from cases similar to Inkrott, 563 N.E.2d at 31, and UNR-Rohn, Inc., 687 N.E.2d at 239, does not support Koss Corporation's contention when read in context. As a starting point, Koss Corporation focuses exclusively on the words "commercially unjustifiable" without considering the context in which the term "commercially unjustifiable" is employed. Courts ask whether it was commercially unjustifiable to "disregard and refuse to learn facts readily available." Id. To "refuse" to learn facts is to deliberately choose not to learn them. This necessarily implies a subjective suspicion that such facts may exist.

¶51 Koss Corporation asserts that if we conclude that bad faith requires a deliberate failure to investigate suspicious circumstances, such a conclusion would swallow the "actual knowledge" prong of the UFA. We disagree. The actual knowledge phrase in Wis. Stat. § 112.01(9) requires the bank to have

23

"actual knowledge that the fiduciary is committing a breach of the fiduciary's obligation as fiduciary." § 112.01(9). Bad faith, on the other hand, requires a bank to have knowledge of compelling and obvious facts that raise a subjective suspicion that a fiduciary has breached its fiduciary obligations. Furthermore, with knowledge of such compelling and obvious facts, the willful failure to further investigate those facts must be due to the bank's desire to avoid potentially obtaining actual knowledge of a fiduciary's misconduct. Buffets, Inc., 732 F.3d at 901; see also Mikrut, 832 N.E.2d at 385 (explaining that to establish bad faith, evidence must be presented that the bank suspected the fiduciary was acting improperly and deliberately refrained from investigating so that the bank could avoid knowledge that the improper fiduciary conduct).

b. The test for bad faith[13]

¶52 From the foregoing discussion, we recognize several UFA foundational principles that form the framework for analyzing a bank's conduct when bad faith is alleged. First, bad faith is reviewed on a transaction by transaction basis, such that the facts known to each individual bank employee are not aggregated to form collective knowledge of the bank. Colby v. Riggs Nat'l Bank, 92 F.2d 183, 195 (D.C. Cir. 1937) (concluding that "[i]t must be remembered also that practically

---

[13] We do not adopt the court of appeals test because, as we explain below, we set out a test that is more consistent with the majority of jurisdictions that have defined bad faith under the UFA than is the test chosen by the court of appeals.

24

all the clues are not known to any one employee of the bank, and that the facts known to any one employee are not sufficient to arouse suspicion."). Second, whether a bank acted in bad faith is determined at the time of the breach of fiduciary duty, not by looking back at transactions that occurred many months earlier. Bolger, 143 Wis. 2d at 777-78 n.5.

¶53 Third, bad faith is an intentional tort; negligence by a bank is insufficient to show bad faith. Lawyers Title Ins. Corp., 904 F. Supp. at 820 (citing Restatement (Second) of Torts § 8A cmt.b (1965)); Wis. Stat. § 112.01(1)(c). Fourth, considerations of bad faith require analyses of a bank's actions to determine its subjective intent. Caputo, 748 A.2d at 514; Attorneys Title Guar. Fund, 179 F. Supp. 2d at 1277 (concluding that bad faith "is the subjective deliberate desire to evade knowledge").

¶54 In regard to specific evidence necessary to support an allegation that a bank acted in bad faith, a claimant who shows bank dishonesty will be successful. A majority of courts have held that "[b]ad faith does not exist if the bank was acting honestly." Rheinberger, 150 N.W.2d at 41; Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. Pricewaterhouse Coopers, LLP, 2:0001684, slip op. at *12 (W.D. Penn. July 19, 2011); Guild, 553 P.2d at 958.

¶55 Bad faith requires some evidence of bank dishonesty such as a bank willfully failing to further investigate compelling and obvious known facts that suggest fiduciary misconduct because of a deliberate desire to evade knowledge of

25

fiduciary misconduct. Caputo, 748 A.2d at 514; see also Trenton Trust Co. v. W. Sur. Co., 599 S.W.2d 481, 492 (Mo. 1980) (concluding that the failure to further investigate suspicious circumstances is not bad faith "unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction"). Bank inaction under those circumstances is an intentional tort. Id.; see also Davis, 12 A.2d at 69 (explaining that the distinction between negligence and bad faith "is that bad faith, or dishonesty, is, unlike negligence, wilful").

## C. Application

¶56 The evidence presented by Koss Corporation does not raise a genuine issue of material fact as to whether Park Bank acted in bad faith during any transaction related to Sachdeva's embezzlement.[14] We first address Koss Corporation's arguments that Park Bank's policies and general practices constitute bad faith; then we address the three types of transactions Sachdeva employed: cashier's checks, petty cash requests, and wire transfers.

### 1. Policies and General Practices

¶57 Many of Koss Corporation's allegations in regard to bad faith are driven by Koss Corporation's assertion that Park

---

[14] Generally, the determination of bad faith is for the trier of fact unless only one finding can be made as a matter of law. N.J. Title Ins. Co. v. Caputo, 748 A.2d 507, 514 (N.J. 2000).

26

Bank's general practice of not enforcing bank policies contributed to Koss Corporation's loss.  For example, Koss Corporation asserts that Park Bank had a "practice of giving out cashier's checks . . . to persons not authorized on the signature card," had "inadequate policies to detect suspicious activity," and "routinely violated" its stated wire transfer policy.  These allegations could go toward proving negligence.  However, negligence is not at issue; Koss Corporation has voluntarily dismissed its negligence claim.  Park Bank's general practices do not suggest that any employee of Park Bank deliberately failed to investigate compelling and obvious known facts that suggested impropriety by Sachdeva because of the belief or fear that such inquiry would disclose fiduciary misconduct.

¶58 Koss Corporation cites to Inkrott, 563 N.E.2d 26, in which the Supreme Court of Ohio found bad faith under the UFA when a bank had "established a procedure where a transfer from one corporate account to another would be presumed correct and would not be questioned." Id. at 31.  Koss Corporation contends this suggests that a bank's policy, itself, is sufficient to support a finding of bad faith.  However, assuming without deciding that the Inkrott decision is not an outlier, Inkrott is distinguishable from the case now before us.

¶59 In Inkrott, the court determined that the policies enacted by the bank were "more than negligent," they were "designed to promote [the bank's] own self-interest in derogation of the Uniform Commercial Code and beyond the

27

protections provided by the Uniform Fiduciaries Act." Id. at 31. In other words, the Inkrott decision concluded that in establishing bank policies, the bank enacted deficient procedures for the purpose of allowing the bank to avoid discovering evidence of misconduct by fiduciaries. Here, there has been no offer of proof that Park Bank established deficient bank policies in order to avoid discovering fiduciary misconduct.

¶60 Koss Corporation's allegation is quite the opposite. Koss Corporation alleges that Park Bank's general practice of carelessly failing to follow its own policies facilitated Sachdeva's embezzlement. However, carelessness is a negligence standard, Zastrow v. Journal Commc'ns, Inc., 2006 WI 72, ¶30, 291 Wis. 2d 426, 718 N.W.2d 51, and negligence is insufficient to support a claim for bad faith under the UFA. O'Neal v. Sw. Mo. Bank of Carthage, 118 F.3d 1246, 1251 (8th Cir. 1997).

### 2. Cashier's Checks

¶61 Koss Corporation alleges that Park Bank's processing Sachdeva's requests for cashier's checks constituted bad faith. Koss Corporation points to Park Bank's method of readying cashier's checks for non-signatories, as well as Holly Pape's testimony, years after cashier's checks were issued, that the number of cashier's checks Mulvaney ordered was "strange."[15]

---

[15] Holly Pape was the Park Bank employee assigned to work with Koss Corporation.

¶62 Over the ten years of Sachdeva's embezzlement, 49 bank employees issued the 359 cashier's checks to Koss Corporation employees at Sachdeva's request.[16] Koss Corporation has provided no evidence that any of those 49 employees was dishonest in processing Sachdeva's requests because the employee believed the transaction in which he or she engaged was improper for Sachdeva to have initiated. Stated otherwise, there is no evidence that any Park Bank employee had knowledge of compelling and obvious facts that suggested impropriety by Sachdeva that the employee willfully failed to further investigate because of a deliberate desire to evade knowledge of Sachdeva's misconduct or that such an employee shared his or her suspicions with another employee.[17]

¶63 Another problem for Koss Corporation is the relevance of the evidence it did present. That a non-signatory made requests for cashier's checks and later picked them up is not relevant to the issue of bad faith. Koss Corporation does not dispute that its employees were acting at Sachdeva's direction, or argue that any of its other employees stole money. Koss Corporation does not explain how Mulvaney's being a non-signatory amounted to an obvious and compelling fact that

[16] Park Bank issued more than 60,000 cashier's checks during that same period of time.

[17] Although we do not examine transactions collectively when reviewing a claim of bad faith, we note that Park Bank provided monthly statements to Koss Corporation. Those monthly statements included a complete listing of every transaction Sachdeva initiated, including the date and the amount of each transaction.

29

Sachdeva was breaching her fiduciary obligations to Koss Corporation.

¶64 With respect to the $60,568.03 counter check that a non-signatory drafted, cashed and used to purchase two cashier's checks, Koss Corporation has never asserted that this transaction was not personally initiated by Sachdeva or honestly completed by Park Bank. Koss Corporation appears to argue that Park Bank was negligent in permitting a non-signatory this much latitude, but negligent conduct is not sufficient to support bad faith, which is grounded in intentional conduct. It is undisputed that Sachdeva, a signatory and Vice President of Finance for Koss Corporation, carried out each cashier's check transaction personally or through an agent. There is no genuine issue of material fact as to whether Park Bank acted in bad faith regarding any of the cashier's checks.

### 3. The Petty Cash Requests

¶65 Koss Corporation's argument surrounding petty cash requests fails for reasons similar to those applied above to cashier's checks. It is true that on 43 occasions, Sachdeva drafted checks for petty cash at Koss Corporation's offices and that Park Bank allowed non-signatories to retrieve the cash at Sachdeva's request.[18]

¶66 Furthermore, Koss Corporation provides no proof that Park Bank did not cash Koss Corporation checks in the honest

---

[18] During that same period of time, Park Bank cashed more than 7.6 million checks for its customers.

belief that Sachdeva had authority to draft them and to authorize a Koss Corporation employee to cash them. And finally, no evidence has been proffered that any Park Bank employee knew compelling and obvious facts that suggested impropriety by Sachdeva and then willfully failed to further investigate those facts because of a deliberate desire to evade knowledge of misconduct by Sachdeva. Accordingly, there is no genuine issue of material fact as to whether Park Bank acted in bad faith under the UFA with regard to Sachdeva's petty cash requests.

### 4. Wire Transfers

¶67 Koss Corporation's final argument is that Park Bank's violation of its own wire transfer policy by conducting wire transfers without a wire transfer agreement in place constituted bad faith. Between 2004 and 2009, Park Bank made seven wire transfers totaling $2 million from Koss Corporation's Park Bank accounts to Koss Corporation's accounts with Chicago banks.[19]

¶68 Koss Corporation requested wire transfers over the phone, sometimes by a non-signatory, in violation of Park Bank's wire transfer policy. Sachdeva later used wire transfers from Koss Corporation's Chicago banks to pay more than $16 million in credit card bills. However, Sachdeva's misconduct with regard to Koss Corporation's Chicago banks does not give rise to a triable issue of fact in the matter before us.

---

[19] During that same period of time, Park Bank made more than 40,000 wire transfers on behalf of its customers.

¶69 No evidence has been proffered that Park Bank did not honestly complete the wire transfers or that any Park Bank employee who participated in them was suspicious that Sachdeva was violating her fiduciary obligation to Koss Corporation in commencing the transfers. Additionally, Koss Corporation does not dispute that each wire transfer was to another Koss Corporation bank account. Koss Corporation retained possession of the funds after each wire transfer. Koss Corporation also does not explain why wire transfers that were admittedly sent to other Koss Corporation bank accounts would have raised suspicions on the part of any Park Bank employee. Accordingly, there is no genuine issue of material fact as to whether Park Bank acted in bad faith with regard to any of the seven wire transfers.

D. Summary Judgment

¶70 Summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Dufour, 370 Wis. 2d 313, ¶12; Wis. Stat. § 802.08(2).

¶71 While discovery was extensive and conducted for years, no proof has been proffered from which a factfinder could find that any Park Bank transaction was not honestly done. There is much here from which a claim of negligence could be made. However, negligence is not sufficient to establish bank liability for transactions that were honestly done.

32

Rheinberger, 150 N.W.2d at 41; Pricewaterhouse Coopers, LLP, 2:0001684, slip op. at *12; Guild, 553 P.2d at 958; Wis. Stat. § 112.01(1)(c). Furthermore, there was no proffer of proof from which a factfinder could infer dishonesty by finding that Park Bank willfully failed to further investigate compelling and obvious known facts suggesting Sachdeva's embezzlement because of Park Bank's desire to evade further knowledge out of fear that it would find her misconduct. We conclude that the court of appeals did not err in affirming the circuit court's summary judgment that dismissed Koss Corporation's complaint against Park Bank.

## E. Third Party Claims

¶72 Park Bank brought third-party claims against Grant Thornton LLP and Michael Koss for contribution and equitable subrogation, contingent on Park Bank's having liability to Koss Corporation. Because we conclude that Park Bank is not liable to Koss Corporation, we affirm the circuit court's dismissal of Park Bank's third-party claims without further comment.

## III. CONCLUSION

¶73 We conclude Wis. Stat. § 112.01(1)(c) describes the term "good faith" as honest bank acts, even when negligently done, and consistent with the majority of jurisdictions' interpretations of the UFA, "bad faith" is inconsistent with the statutory criteria for "good faith." Therefore, bad faith pursuant to § 112.01(9), which is an intentional tort, may be shown by acts evidencing bank dishonesty such as a bank willfully failing to further investigate compelling and obvious

33

known facts suggesting fiduciary misconduct because of a deliberate desire to evade knowledge of fiduciary misconduct.

¶74 We further conclude that given the allegations that Koss Corporation asserts in regard to its claim that Park Bank is liable for the intentional tort of bad faith, no proof has been proffered of bank dishonesty wherein Park Bank willfully failed to further investigate compelling and obvious known facts suggesting fiduciary misconduct because of a deliberate desire to evade knowledge of fiduciary misconduct.

¶75 Accordingly, we affirm the court of appeals' affirmance of the circuit court's dismissal of Koss Corporation's claim that Park Bank acted in bad faith in processing Sachdeva's transactions. Because we conclude Park Bank is not liable to Koss Corporation, we also affirm the dismissal of Park Bank's third-party claims.

*By The Court*.—The decision of the court of appeals is affirmed.

¶76 ANN WALSH BRADLEY, J. *(concurring).* I agree with the lead opinion[1] that summary judgment was properly granted to

_____

[1] I use the term "lead" opinion because I am concerned that without this cue, the reader may mistakenly believe that the lead opinion has precedential authority. Although five justices join in the mandate of the opinion to affirm the court of appeals, it represents the reasoning of only two justices (Roggensack, C.J., joined by Ziegler, J.). I, along with Justices Abrahamson and Dallet, join in the mandate, but would rely on contrary reasoning. Justice Kelly, joined by Justice Rebecca Grassl Bradley, does not join in the mandate of the court, and would adopt a legal standard for bad faith that is also contrary to the lead opinion's formulation. Thus, although set forth in two separate opinions (this concurrence and Justice Kelly's dissent), five justices would not adopt the legal standard for bad faith set forth by the lead opinion.

In order to alert the public, litigants and courts, I urge the court to adopt a procedure requiring the author of a lead opinion to include an admonition that it is a lead opinion. The rationale for such a procedure is simple: lest there be confusion that the first appearing opinion be regarded as the majority opinion.

Recently such confusion arose in news reports referring to this court's opinion in State v. Mitchell, 2018 WI 84, 383 Wis. 2d 192, 914 N.W.2d 151, cert. granted, 2019 WL 166881 (U.S. Jan. 11, 2019) (No. 18-6210), announcing that the United States Supreme Court granted certiorari in that case. The first appearing opinion gave no alert that it was anything other than a majority opinion. Some media reports apparently assumed that the first appearing opinion garnered sufficient votes and referred to it as a majority opinion. See Kevin Lessmiller and Barbara Leonard, Unconscious Driver DUI Case Taken Up by Supreme Court, Courthouse News Service (Jan. 11, 2019), https://www.courthousenews.com/justices-take-up-unconscious-drivers-dui-case/. Litigants and courts may inadvertently make the same erroneous assumption.

(continued)

1

Park Bank.  <u>See</u> lead op., ¶71.  I write separately, however, because in interpreting a uniform law, the lead opinion unearths a heretofore unknown standard for bad faith.

¶77 The lead opinion errs in its creative exercise in two ways.  First, this new standard for bad faith runs afoul of the legislative directive that uniform laws are to be interpreted uniformly with other jurisdictions.  Second, the legal standard

---

The only reference to "lead opinions" in our Internal Operating Procedures (IOPs) states that if during the process of circulating and revising opinions, "the opinion originally circulated as the majority opinion does not garner the vote of a majority of the court, it shall be referred to in separate writings as the 'lead opinion.'"  Wis. S. Ct. IOP III(G)(4) (Feb. 22, 2018).  The potential confusion that arises from mislabeling a lead opinion is exacerbated because the precedential effect (or lack thereof) of a lead opinion is uncertain.  This remains an uncertainty even though two prior certifications from the court of appeals have asked us to resolve the issue.  <u>State v. Dowe</u>, 120 Wis. 2d 192, 192–93, 352 N.W.2d 660 (1984); <u>State v. Hawley</u>, No. 2015AP1113-CR, unpublished certification, 2-3 (Nov. 21, 2018); <u>see also</u> <u>State v. Lynch</u>, 2016 WI 66, ¶145, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson and Ann Walsh Bradley, JJ., concurring in part, dissenting in part).

In the midst of the potential confusion and uncertainty, the very least we can do is to alert the reader to beware that no part of the rationale in the first appearing opinion has garnered a majority vote.  Unlike the first appearing opinion in <u>Mitchell</u>, 383 Wis. 2d 192, which completely failed to advise, the lead opinion here takes a first step.  It announces that only two justices join the opinion in totality.  But that leaves unanswered the question of whether any of the separate writings join in part.

When the opinion originally circulated as the majority fails to garner sufficient votes during the process of revising and circulating opinions, it should as clearly as possible advise the reader of its status.  It is not something that should be hidden or left for the reader to figure out.

2

for bad faith that the lead opinion embraces is too exacting on bank customers with Uniform Fiduciaries Act (UFA) claims.

¶78 Because I determine that Wisconsin should adopt a bad faith standard that promotes uniformity among the states, vindicates the purpose of the UFA, and provides bank patrons with a meaningful check on bank behavior, I respectfully concur.

I

¶79 The Uniform Law Commission, which has a diverse representation from all fifty states, promulgates uniform laws for consideration by state legislatures. "The purpose of uniform laws is to establish both uniformity of statutory law and uniformity of case law construing the statutes, ensuring certainty and guidance to litigants who rely on the courts to interpret uniform statutes in a predictable and consistent manner." Estate of Matteson v. Matteson, 2008 WI 48, ¶42, 309 Wis. 2d 311, 749 N.W.2d 557 (citing M.J. Wallrich Land & Lumber Co. v. Ebenreiter, 216 Wis. 140, 143, 256 N.W. 773 (1934)). In this context, the goal is to provide uniformity and predictability for both banks and those who use them, regardless of the state in which the banking transaction occurs.

¶80 At issue here is the bad faith provision set forth in Wisconsin's enactment of the UFA. Wis. Stat. § 112.01(9). It is substantially identical to other state enactments throughout

the country.[2]  Pursuant to this provision, a bank that wrongfully cashes a check can be liable to a defrauded principal if one of two possibilities is fulfilled:  (1) the bank has actual knowledge that the fiduciary is committing a breach of his or her obligations or (2) the bank acts in "bad faith." § 112.01(9).[3]  The question before us is the standard that must be fulfilled for a plaintiff to prove "bad faith" in this context.

¶81 The lead opinion observes that "bad faith" is inconsistent with "good faith," a defined term in the statute. Lead op., ¶3; see Wis. Stat. § 112.01(1)(c).  Using the definition of "good faith" as a springboard, it concludes that "bad faith pursuant to § 112.01(9), which is an intentional tort, may be shown by acts evidencing bank dishonesty such as a bank willfully failing to further investigate compelling and obvious known facts suggesting fiduciary misconduct because of a

---

[2] See, e.g., Ariz. Rev. Stat. Ann. § 14-7507; 760 Ill. Comp. Stat. 65/8; Ind. Code § 30-2-4-8; Md. Code Ann., Est. & Trusts § 15-207; Minn. Stat. § 520.08; N.J. Stat. Ann. § 3B:14-55; N.C. Gen. Stat. § 32-9; Ohio Rev. Code Ann. § 5815.07; 7 Pa. Cons. Stat. § 6392.

[3] Wis. Stat. § 112.01(9) provides:

If a check is drawn upon the account of a fiduciary's principal in a bank by a fiduciary, who is empowered to draw checks upon his or her principal's account, the bank is authorized to pay such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of the fiduciary's obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith.

4

deliberate desire to evade knowledge of fiduciary misconduct." Lead op., ¶3.

¶82 Wisconsin Stat. § 112.01 does not define "bad faith." However it does provide some guidance to our endeavor, dictating that our state's UFA "shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it." § 112.01(14). Thus, we look to the case law of other states to guide our analysis.

¶83 The lead opinion correctly observes that other jurisdictions have been inconsistent in defining bad faith when it states, "variations in facts from which claims of bad faith arose have resulted in different expressions of the definition of bad faith, with bank dishonesty expressed in most decisions." Lead op., ¶31 (citations omitted). However, it errs when it deviates from the legislative directive that the interpretation of our uniform laws be consistent with the interpretations adopted by our sister states.

¶84 Contrary to the directive, the lead opinion adopts a standard for bad faith that is inconsistent with the majority of our sister states that have interpreted the uniform act. It is not even consistent with a minority of states' interpretations. The standard for bad faith that the lead opinion embraces does not closely track the case law in any other jurisdictions. Wisconsin stands alone.

II

¶85 Although there has been some inconsistency in interpretation among the various states, not all expressions of

5

the definition of bad faith are created equal. The standard this court adopts should promote uniformity and vindicate the purpose of the UFA, while at the same time avoid placing an inordinate and nearly impossible burden on bank patrons.

¶86 Several courts have adopted such a standard. They interpret the UFA bad faith standard to attach liability to a bank in the event the bank does not affirmatively act but simply "remains passive" in the face of compelling and obvious facts suggesting fiduciary misconduct. See; In re Broadview Lumber Co., 118 F.3d 1246, 1251 (8th Cir. 1997); Maryland Cas. Co. v. Bank of Charlotte, 340 F.2d 550, 554 (4th Cir. 1965); Time Savers, Inc. v. LaSalle Bank, N.A., 863 N.E.2d 1156, 1165 (Ill. App. Ct. 2007);; New Jersey Title Ins. Co. v. Caputo, 748 A.2d 507, 514 (N.J. 2000). As the New Jersey supreme court stated the standard in Caputo:

> [B]ad faith denotes a reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary. It is not established by negligent or careless conduct or by vague suspicion. Likewise, actual knowledge of and complicity in the fiduciary's misdeeds is not required. However, where facts suggesting fiduciary misconduct are compelling and obvious, it is bad faith to remain passive and not inquire further because such inaction amounts to a deliberate desire to evade knowledge.

Caputo, 748 A.2d at 514.

¶87 I would adopt the Caputo standard in Wisconsin. This standard is preferable to that proffered by the lead opinion because it promotes uniformity and emphasizes that no "high degree of moral guilt" is required on the part of the bank. See Wis. Stat. § 112.01(14); Maryland Cas. Co., 340 F.2d at 554.

6

"Neither criminal fraud nor downright corruption is an essential ingredient of legal 'bad faith.'" Maryland Cas. Co., 340 F.2d at 554. The Caputo standard would permit bank patrons with legitimate claims a better chance at relief. Otherwise, it is the rare customer indeed that will be able to demonstrate "willful" and "deliberate" actions on the part of a bank.

¶88 Importantly, such a standard also remains consistent with the purpose of the UFA. The UFA was instituted to provide banks with relief from the dire consequences of the previous common law rule that entities dealing with fiduciaries had the duty to assure that fiduciary funds were properly applied to the account of the principal. Bolger v. Merrill Lynch Ready Assets Tr., 143 Wis. 2d 766, 774, 423 N.W.2d 173 (Ct. App. 1988); see Master Chem. Corp. v. Inkrott, 563 N.E.2d 26, 29 (Ohio 1990) ("By altering the common law, the Act relaxes some of the harsher rules which require of a bank and of individuals the highest degree of vigilance in the detection of a fiduciary's wrongdoing.") (internal quotations and citations omitted). It was meant to "facilitate banking and financial transactions and place on the principal the burden of employing honest fiduciaries[,]" thereby relieving banks of their previously onerous duty. Bolger, 143 Wis. 2d at 775 (citing Johnson v. Citizens Nat'l Bank of Decatur, 334 N.E.2d 295, 300 (Ill. App. Ct. 1975)).

¶89 Although the UFA was certainly enacted to provide relief to banks, it should not make proving a bank's liability a mountain that is nearly impossible for a bank customer to scale.

7

The Caputo standard strikes the right balance by furthering the purpose of the UFA while at the same time allowing bank patrons a more significant check on bank behavior.

### III

¶90 I conclude that even under the less exacting Caputo standard, summary judgment for Park Bank is appropriate. Koss has not put forth evidence sufficient to create a genuine issue of material fact that Park Bank remained passive in the face of "compelling and obvious" facts suggesting fiduciary misconduct.

¶91 The sheer number of transactions and number of Park Bank employees involved in cashing Koss checks belie Koss's assertion that a nefarious pattern was apparent. Over the ten years of Sachdeva's embezzlement, a period during which Park Bank issued greater than 60,000 cashier's checks, forty-nine bank employees issued the 359 cashier's checks requested by Sachdeva. Lead op., ¶62, n.16. Neither "the amount and number of transactions carried out on an account containing fiduciary funds, nor the mere names of payees on checks drawn on that account, are sufficient to create bad faith liability based on the bank's action in paying such checks." Heffner v. Cahaba Bank & Tr. Co., 523 So. 2d 113, 115 (Ala. 1988).

¶92 Indeed, Koss itself did not notice the fraud for years. Even viewed in the light most favorable to Koss, the facts of this case do not present the "compelling and obvious" suggestion of fiduciary misconduct so as to foist liability onto Park Bank.

¶93 For the above stated reasons, I respectfully concur.

8

¶94 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON and Justice REBECCA FRANK DALLET join this concurrence.

¶95 DANIEL KELLY, J. *(dissenting)*. There is no bad faith, Park Bank says, when it disburses funds from fiduciary accounts while intentionally remaining ignorant of whether the individuals making the requests have authority to transact business on those accounts. The court agreed——not as a matter of fact, but of law. Because the law does not require that conclusion, I respectfully dissent.

*

¶96 Bad faith does not exist in a vacuum——it occurs in the context of a specific relationship. Here, Koss Corporation tells us the bad faith took place within a relationship created by statute as well as the documentation requested and maintained by Park Bank. With respect to the latter, Park Bank provided a copy of its Depository Declaration form to Koss Corporation to complete and return. The form's purpose is to identify the Koss Corporation employees who have authority to transact business on the company's accounts:

> The persons and the number thereof designated by name or title on the reverse side opposite the accounts ("authorized person") are authorized, for and on behalf of the Depositor, (a) to sign checks, drafts notes, bills, certificates of deposit and other orders for payment or withdrawal of money from the accounts and to issue instructions regarding them, (b) to endorse for cash, deposit, negotiation, collection or discount by the Bank any and all checks, drafts, notes, bills, certificates of deposit or other instruments or orders for the payment of money owned or held by the Depositor.

1

Koss Corporation identified its President & CEO,[1] Vice-President of Finance,[2] Vice-President of Sales,[3] and Vice-President of MIS as the only "authorized persons" to transact business on its general account.

¶97 Koss Corporation subsequently submitted a Corporate Authorization Resolution to Park Bank, which (as with the Depository Declaration) identified the employees authorized to transact business on its accounts. It provided that "[a]ny agent listed below, subject to any written limitations, is authorized to exercise the powers granted as indicated below: . . . (3) Endorse checks and orders for the payment of money or otherwise withdraw or transfer funds on deposit with this Financial Institution." The resolution identified only three people: Michael J. Koss, John C. Koss Jr., and Sujata Sachdeva. Together, the resolution and Depository Declaration serve as the "signature card," and so I will refer to them as such.

¶98 Park Bank had Koss Corporation's completed signature card on file before Ms. Sachdeva embarked on her embezzlement spree, and it remained on file all during her criminal behavior. So that is the documentary aspect of Koss's relationship with Park Bank.

---

[1] Michael Koss

[2] Koss Corporation's Vice-President of Finance was Sujata Sachdeva.

[3] John C. Koss Jr.

2

¶99 The statutory aspect of the Park Bank/Koss Corporation relationship arises from Wis. Stat. § 112.01(9), a provision that received such intense, but narrow, inspection that its significance seems to have become a little warped. The court's analysis, with a heavy assist from the parties, gives the impression that § 112.01(9) created a bank-specific tort of "bad faith." It didn't. Customers were free to bring bad faith actions against banks before adoption of § 112.01(9), and they can, right now, bring those claims without ever mentioning this statute. And that is true because § 112.01(9) does nothing but give banks limited immunity from liability for improper transactions on fiduciary accounts.

¶100 The statute starts with a grant of immunity, followed by two potentially relevant exceptions.[4] The immunity provision says: "If a check is drawn upon the account of a fiduciary's principal in a bank by a fiduciary, who is empowered to draw checks upon his or her principal's account, the bank is authorized to pay such check without being liable to the principal . . . ." Wis. Stat. § 112.01(9). The relevant exception clauses say the immunity applies "unless the bank pays the check [1] with actual knowledge that the fiduciary is committing a breach of the fiduciary's obligation as fiduciary in drawing such check, or [2] with knowledge of such facts that its action in paying the check amounts to bad faith." Id.

---

[4] The lead opinion lists all three potential exceptions to immunity. See lead op., ¶¶27-28. However, because the facts of this case do not implicate the third exception, I will confine my attention to the first two.

3

¶101 The first exception to immunity depends on the nature of the fiduciary's actions. That is, the analysis focuses on the fiduciary's culpable conduct in relation to his company. If the fiduciary is "committing a breach of the fiduciary's obligation," and the bank knows it, there is no immunity from liability. Id. I'll refer to this exception as a "Fiduciary Breach Exception." The second exception, however, depends on the bank's conduct in relation to the company. If the bank's knowledge of relevant facts makes the transaction an act of bad faith, there is no immunity. That is to say, Wis. Stat. § 112.01(9) provides no defense against a common-law claim of bad faith. I'll refer to this exception as a "Bad Faith Exception."

¶102 The difference between the Fiduciary Breach Exception and the Bad Faith Exception is important because Koss Corporation's complaint described two conceptually distinct categories of transactions. The first comprises those in which Ms. Sachdeva personally contacted Park Bank to initiate the process. The second encompasses those initiated by Koss Corporation employees who were not listed on the signature card maintained by Park Bank. The court collapsed the two, and applied an analysis to the resulting mélange that was suitable for only one of the categories. In doing so, it missed Park Bank's potential bad faith with respect to many of the transactions described by Koss Corporation.

¶103 A proper assessment of Park Bank's potential liability requires us to test the two categories of suspect transactions

4

against the two exceptions to the immunity provided by Wis. Stat. § 112.01(9). The four possible permutations are as follows:

> 1. Did the transactions initiated by Ms. Sachdeva create a Fiduciary Breach Exception to immunity (Combination 1)?
>
> 2. Did the transactions initiated by Ms. Sachdeva create a Bad Faith Exception to immunity (Combination 2)?
>
> 3. Did the transactions initiated by unauthorized Koss employees create a Fiduciary Breach Exception to immunity (Combination 3)?
>
> 4. Did the transactions initiated by unauthorized Koss employees create a Bad Faith Exception to immunity (Combination 4)?

Because my purpose in this dissent is simply to demonstrate that Koss Corporation identified matters that should have gone to the jury for its consideration, I will not assess each of the combinations; addressing only the fourth should be sufficient to make the point.

*

¶104 With respect to Combination 4, the task is to determine whether Park Bank acted in bad faith when it processed a transaction on a fiduciary account without first checking the fiduciary's name against the signature card. And so we arrive at the heart of the lead opinion, to wit, the definition of "bad faith." It said that, for purposes of Wis. Stat. § 112.01(9), "bad faith" means "acts evidencing bank dishonesty such as a bank willfully failing to further investigate compelling and obvious known facts suggesting fiduciary misconduct because of a deliberate desire to evade knowledge of fiduciary misconduct."

5

Lead op., ¶¶3, 73.  I disagree with this formulation because it improperly mixes elements of the Fiduciary Breach Exception with elements of the Bad Faith Exception.

¶105 As I mentioned above, the Fiduciary Breach Exception inquires into the fiduciary's fidelity to his company.  The Bad Faith Exception does not.  With respect to this exception, the terms of Wis. Stat. § 112.01(9) require only that the bank know of facts sufficient to demonstrate it——the bank——had acted in bad faith in conducting the transaction.  And although bad faith may arise out of knowledge of a fiduciary's misconduct, the statute's terms do not limit the tort to such a situation.  Nor does the statute's context or structure suggest such a reading is necessary, or even reasonable.  So when the court borrowed "fiduciary misconduct" from the Fiduciary Breach Exception and imported it into the Bad Faith Exception, it gratuitously and atextually limited the type of facts that could establish a bank's bad faith.

¶106 I agree with Justice Ann Walsh Bradley that we should adopt a definition of "bad faith" that comports with our sister states.  However, I would not adopt (as she does) the Caputo standard because it, too, conflates the Fiduciary Breach Exception with the Bad Faith Exception.  The New Jersey Supreme Court said:

> [B]ad faith denotes a reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary.  It is not established by negligent or careless conduct or by vague suspicion.  Likewise, actual knowledge of and complicity in the fiduciary's misdeeds is not required.  However, where facts suggesting fiduciary

6

misconduct are compelling and obvious, it is bad faith to remain passive and not inquire further because such inaction amounts to a deliberate desire to evade knowledge.

N.J. Title Ins. Co. v. Caputo, 748 A.2d 507, 514 (N.J. 2000). The references to the fiduciary's "impropriety," "misdeeds," or "misconduct" (if we adopted this test) would read into the Bad Faith Exception limiting factors that simply do not exist in the statute's language.

¶107 I think the United States Court of Appeals for the Fourth Circuit more accurately assesses bad faith in this context:

> Neither criminal fraud nor downright corruption is an essential ingredient of legal 'bad faith.' The 'bad faith' test was borrowed from the Uniform Negotiable Instruments Act. The standard used in construing the term under that Act has not been evil motive. Instead courts have asked whether it was 'commercially' unjustifiable for the payee to disregard and refuse to learn facts readily available. At some point, obvious circumstances become so cogent that it is 'bad faith' to remain passive.

Maryland Cas. Co. v. Bank of Charlotte, 340 F.2d 550, 554 (4th Cir. 1965) (citations and footnote omitted). This standard is compatible with the language of Wis. Stat. § 112.01(9) because it does not limit the tort to instances of fiduciary misconduct. Instead, it accurately reflects the statutory structure in that it allows a plaintiff to address the bank's bad faith independently from that of the fiduciary.

\*

¶108 Applying those principles to this case inevitably leads to the conclusion that the circuit court should have allowed Koss Corporation to submit the Combination 4

7

transactions to the jury. Everyone acknowledges that Park Bank allowed Koss Corporation employees who were not listed on the signature card to request and pick up cashier's checks. See lead op., ¶63.[5] They also agree that Park Bank allowed one such employee to draft a counter check against Koss Corporation's account, cash it, and use the proceeds to purchase two cashier checks. Id., ¶64. The facts of record demonstrate that a jury could find Park Bank acted in bad faith when it remained intentionally ignorant of whether the individuals transacting business on Koss Corporation's accounts had the authority to do so.

¶109 In summarily dismissing the significance of this conduct, the court illustrated the defect in its analytical structure. It said that "Koss Corporation does not explain how Mulvaney's being a non-signatory amounted to an obvious and compelling fact that Sachdeva was breaching her fiduciary obligations to Koss Corporation." Id., ¶63. That misses the point. If we were analyzing this case under the Fiduciary Breach Exception to immunity, we would be interested in Ms. Sachdeva's conduct toward Koss Corporation. But we aren't doing that analysis, and so we aren't particularly interested in Ms. Sachdeva's behavior. We are instead assessing Koss

---

[5] Although these employees were not listed as individuals authorized to transact business on Koss Corporation's accounts, they were, nonetheless, fiduciaries. According to Wis. Stat. § 112.01(1)(b), a "fiduciary" includes an "agent" of a corporation. It is fair to say that the Koss Corporation employees were holding themselves out as agents of the company when they transacted business on Koss Corporation's accounts.

Corporation's claims under the Bad Faith Exception to immunity, which means the proper focus is on Park Bank's conduct toward Koss Corporation.

¶110 Properly re-oriented, the undisputed facts reveal a pattern of conduct that should cause any corporate officer's heart to fearfully skip a beat, or several. Park Bank said, unapologetically(!), that its policy is to remain intentionally and steadfastly ignorant of whether an individual has the authority to transact business on a fiduciary account. Avoiding that knowledge takes some effort because the information resides in the bank's own records. It's in the signature card, the specific purpose of which is to tell the bank which of Koss Corporation's employees may access the company's accounts. Yet the bank deliberately and consistently refused to consult the signature card to determine whether it was helping an unauthorized person gain access to a fiduciary account.

¶111 This is not evidence of negligence, as the court would have it. Id., ¶57. Negligence would be a bank employee forgetting to check the signature card, or checking so cursorily that the names failed to register in his mind, or a training regimen that failed to teach employees to check the signature cards, or an inconstant enforcement of a policy to check the signature cards. None of that is at issue here. What Park Bank did was intentional. It chose to ignore its depositors' signature cards. It chose not to know whether the Koss Corporation employees with whom it was dealing had the authority to access the company's accounts. It chose to have a policy of

9

ignorance with respect to its customers' instructions. The consequence of those intentional choices was that it disbursed enormous sums of money to people who were not authorized to access Koss Corporation's accounts.

¶112 This does not mean, however, that Park Bank is necessarily liable to Koss Corporation. It is possible that a jury would find no bad faith in Park Bank's conduct. Further, Koss Corporation must still prove that Park Bank's actions were the proximate cause of its damages. If Park Bank had called Koss Corporation when an unauthorized employee tried to access its accounts, perhaps Ms. Sachdeva's embezzlement attempt would have been revealed. We know this is possible, because her scheme came to light when American Express observed suspicious activity on Koss Corporation's account and called to investigate. Or perhaps Park Bank's call would have gone to Ms. Sachdeva, who would have been in a position to ratify what the unauthorized employee was doing.

¶113 These "perhaps" are within the jury's province, and a jury should have been allowed to consider them. Caputo, 748 A.2d at 514 ("The test for good or bad faith is a subjective one to be determined by the trier of fact unless only one inference from the evidence is possible."). By concluding, as a matter of law, that Park Bank's intentional ignorance of its own records could not amount to bad faith, we erred.

¶114 For the foregoing reasons, I respectfully dissent.

¶115 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this dissent.

10